Carol E. Jendrzey
State Bar No. 10617420
COX SMITH MATTHEWS INCORPORATED
112 East Pecan Street, Suite 1800
San Antonio, Texas 78205
(210) 554-5500
(210) 226-8395 (Fax)
cejendrz@coxsmith.com

**PATIENT CARE OMBUDSMAN**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### LUBBOCK DIVISION

| | | |
|---|---|---|
| **In Re:** § | **CHAPTER 11 CASE** | |
| § | | |
| **LUBBOCK, TEXAS – HIGHLAND** § | **CASE NO. 08-50202-RLJ-11** | |
| **MEDICAL CENTER, L.P.,** § | | |
| § | | |
| **Debtor.** § | | |

### FIRST REPORT OF PATIENT CARE OMBUDSMAN

TO THE HONORABLE ROBERT L. JONES,
UNITED STATES BANKRUPTCY JUDGE:

Carol E. Jendrzey, the duly appointed Patient Care Ombudsman (the "Ombudsman"), submits this her First Report pursuant to 11 U.S.C. § 333(b)(2) and respectfully would show:

### BACKGROUND

1. The Debtor, Lubbock, Texas-Highland Medical Center, L.P. (hereafter, the "Debtor" or the "Hospital") filed for bankruptcy relief under Chapter 11 of the United States Bankruptcy Code on May 31, 2008. The Debtor is a health care business. Thus, on June 25, 2008, the Bankruptcy Court, pursuant to 11 U.S.C. § 333 ordered the appointment of a Patient Care Ombudsman. Thereafter, on July 8, 2008, the Office of the United States Trustee appointed the undersigned to act as the Patient Care Ombudsman (the "Ombudsman Order").

2. On August 25, 2008, pursuant to Bankruptcy Rule 2015.1(a), the Ombudsman filed a Notice of First Report (the "Notice") and served the Notice on the service list and asked

the Debtor to (i) post the Notice on all patient care floors and (ii) to distribute the Notice to each patient admitted to the hospital during the period of August 28, 2008 – September 10, 2008. The Ombudsman has filed a motion to limit service of the notice (Docket No. 153). No one has requested a copy of this report.

3.  The Ombudsman has made two on-site visits and has communicated on a regular basis with both Mr. Tarbox, counsel for the Debtor and Mr. Meeks who is in charge of hospital administration. As described below, the Ombudsman has met with and communicated by telephone and email with counsel for the governmental entities and potential purchasers and their counsel.

## DESCRIPTION OF FACILITY

4.  The Debtor is a 126 bed acute care hospital with an operating room suite, recovery room, intensive care unit, emergency room, medicine and surgical patient care areas, and a wound care center.

5.  The Hospital also has a pharmacy, a lab with 24 hour coverage and radiology services with 12 hour (7:00 a.m. – 7:00 p.m.) on-site coverage and on call coverage after 7:00 p.m.

6.  The Hospital does not offer obstetrical services.

7.  On both visits, the Ombudsman found the Hospital areas clean and corridors clear. The Hospital is experiencing some air conditioning problems and will be undertaking a sprinkler project. The sprinkler system is not in place throughout the hospital. For code compliance, the Hospital has been grandfathered. However, the state has set a deadline for the Hospital for the early part of next year to expand the sprinkler system throughout the Hospital.

A.  <u>ER</u>

8. The emergency room medical staff is provided by Texas Emergency Physician (the "ER Physicians"). The ER Physicians have provided such staffing to the Hospital for the past 13 years. The emergency room (the "ER") sees approximately 25 patients per day. Although the ER is open and staffed 24/7, most of the patient visits are during the day. The ER does not take level 1 or 2 patients. The area's emergency services have been so notified. To the extent a level 1 or 2 patient is brought to ER, they would be transferred to another qualified facility once it is safe to transport the patient.

B. ICU

9. The intensive care unit (the "ICU") has seven beds. At the time of the Ombudsman's first visit there was one patient in the ICU. The patient was sitting in a chair beside her bed. The nursing station is directly outside the patient's room. Patients are visible to the staff from the nursing station. The ICU nurse was monitoring the patient from the nurse's station.

10. During my second visit to the Hospital, the staff reported that no patients had been admitted to ICU in the prior two weeks. However, one ICU nurse was available to cover the ICU should a patient need to be admitted to the ICU.

C. OR

11. Many of the surgeries being performed at the Hospital do not require overnight stays at the Hospital. The Hospital has discontinued performing certain orthopedic procedures due to the expense of the supplies required for such procedures. The physicians are aware of the issue and perform such surgeries at other area hospitals. The Ombudsman toured the operating room (the "OR") on her second visit. There was only one patient awaiting surgery. The patient had his family with him. The Ombudsman spoke with the nursing staff who indicated that they

3

were not experiencing any staffing issues or supply issues. They did acknowledge, as stated above, that no surgeries were performed without first verifying that the necessary supplies and materials were available for a particular procedure. They also confirmed that they had the necessary medical staff available on site for any unanticipated complications during the or during post-op recovery period.

D. <u>Pharmacy</u>

12. On the Ombudsman's first visit, she toured the pharmacy. The pharmacy is a very small area. At the time of this visit, the Hospital was having air conditioning problems in certain parts of the building. The air conditioning problems did not affect the patient care areas. However, they did affect the pharmacy. To maintain the temperature in the area where medication and IV fluids were mixed and maintained, a portable air conditioning unit had been set up. The pharmacist was monitoring the temperatures in that area to ensure that the medications and fluids were stored at proper temperatures.

E. <u>Med/Surg</u>

13. The Ombudsman spoke with the staff on the med/surg floors. The staff did not identify any issues with staffing or supplies.

**MEDICAL RECORDS**

14. Medical records are stored at the Hospital and three off-site areas. As discussed below, the Court has approved the sale of the Hospital and approved a back-up bid. The purchaser has indicated that it may not assume custody of the off-site medical records. Accordingly, the Ombudsman recommends that there be a carve-out or other funding set up to pay for notification of patients and for the storage of medical records as set out in 11 U.S.C. §351.

4

### STAFF

15. The census at the Hospital on both visits was very low. The Hospital has 75 employees. In order to accommodate a decrease in census, the Hospital utilizes on call coverage and assigning staff to different areas including nursing staff to clerical areas, as needed. Thus, staffing has not been an issue in any of the areas. During the time that the Ombudsman has been monitoring the care provided, she has been informed of the payroll issues the Hospital has faced on two payrolls. Notwithstanding that employees have received their payroll checks in "installments" and a few days late, they continue to report for work. In fact, in speaking with the staff, they say they do not want to leave this Hospital. The Ombudsman has been impressed with the staff's loyalty to the Hospital and support of each other.

### PATIENTS

16. The Ombudsman has been contacted by one patient. The patient's complaint concerned admission procedures and has been addressed with the Hospital's management.

17. The Ombudsman also observed care being provided to patients in the ER and in the ICU. No patient care issues were observed.

### PHYSICIANS

18. On the Ombudsman's second visit, the Ombudsman interviewed one of the ER physicians. On the day of the visit, the physicians indicated that there had been some problems obtaining timely results for a particular blood test. The Ombudsman followed up with the laboratory and was told a reagent needed for the test had not been delivered. Thus, the lab was using another lab to run the tests. The reagent was due to arrive the next day.

### FINANCIAL POSITION OF THE HOSPITAL

19. The Ombudsman has monitored the financial situation of the Debtor very closely. The Debtor's financial situation has affected the Debtor's ability to make payroll, which in turn

affects staffing. Thus, the Ombudsman has been proactive in discussions with counsel for certain of the parties in an effort to resolve party differences and facilitate funding. She has also reviewed pleadings and orders in connection with post petition financing and the use of cash collateral. Again, the focus of the Ombudsman's input was to make sure that funds were available to (1) make payroll and (2) purchase supplies for patient care. All the parties have been cooperative and responsive to the Ombudsman's concerns regarding the financial condition of the Debtor. The Ombudsman also has paid close attention to the sales negotiations, particularly as to the issues of transitioning the license to a new owner, the disposition of patients and the disposition of medical records and personally identifiable information. In fact, the Ombudsman spoke to two of the potential buyers about their plans for the Hospital and her concerns regarding the issues listed above. The Ombudsman also filed a pleading in connection with the Bid Procedure.

20. The Ombudsman was supportive of the Debtor's desire to sell the assets provided the purchase and was qualified to assume the operations of the Debtor the sale would not be detrimental to patient care.

21. On September 4, 208, the Court approved the sale of the Hospital. The Ombudsman reviewed and incorporated language in the sale order related to the disposition of medical records and transitioning patient care. Again, all parties were cooperative and responsive to the Ombudsman's requests.

## CONCLUSION

22. As stated above, the Ombudsman is appreciative of the cooperation and support she received from the Debtor and its staff and counsel. The Ombudsman did not identify any patient care concerns that have not been addressed with and by the staff. Currently, there is a purchaser and a back-up purchaser in place to take over the Hospital. Both sales will result in

the purchaser taking over the care of the patients. Thus, once the sale closes, the Ombudsman should not have any further obligations to monitor patient care.

Wherefore, the Ombudsman requests that the Court accept this report and grant such further relief for which she is entitled.

Dated: September 8, 2008

        Respectfully submitted,

        **COX SMITH MATTHEWS INCORPORATED**
        112 E. Pecan Street, Suite 1800
        San Antonio, Texas 78205
        (210) 554-5500
        (210) 226-8395 (Fax)

        By: */s/ Carol E. Jendrzey*
            Carol E. Jendrzey
            State Bar No. 10617420

        PATIENT CARE OMBUDSMAN

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of September, 2008, a true and correct copy of the above and foregoing document was served via U.S. Mail, postage prepaid on the parties listed below.

Max Ralph Tarbox
McWhorter, Cobb & Johnson, LLP
1722 Broadway
P.O. Box 2547
Lubbock, TX 79408

William Parkinson
Office of the U.S. Trustee
Room 976, 1100 Commerce
Dallas, TX 75242

*/s/ Carol E. Jendrzey*
Carol E. Jendrzey