# EXHIBIT "A"

LUBBOCK HERITAGE HOSPITAL, INC.
704 West Cleveland Street
Dimmitt, Texas 79027-3108
phone 806-647-7829
email kdhn1984@yahoo.com


September 2, 2008

Ref: Bid for Lubbock, Texas Highland Medical Center, L.P. assets free and clear of all
liens, claims and encumbrances per order (A) and (B) Case No. 08-50202-rlj11 in THE
UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF
TEXAS, LUBBOCK DIVISION.

The Bid:

LUBBOCK HERITAGE HOSPITAL, INC., A TEXAS CORPORATION, SUBMITS A
BID OF ***THREE MILLION AND ONE DOLLARS ($3,000,001.00)*** FOR THE ASSETS
OF LUBBOCK, TEXAS HIGHLAND MEDICAL CENTER, L.P. ASSETS ARE
PURCHASED FREE AND CLEAR OF ALL LIENS, CLAIMS AND
ENCUMBRANCES.

ATTACHED TO AND A PART OF THIS BID IS A CHECK FOR EARNEST MONEY
IN THE AMOUNT OF FIFTY THOUSAND DOLLARS ($50,000.00) PAYABLE TO
McWHORTER COBB AND JOHNSON TRUST ACCOUNT. IF LUBBOCK
HERITAGE HOSPITAL, INC. IS THE SUCCESSFUL BIDDER, THE FIFTY
THOUSAND DOLLAR ($50,000.00) WILL BE APPLIED TOWARD THE PURCHASE
PRICE. IF LUBBOCK HERITAGE HOSPITAL IS NOT THE SUCCESSFUL BIDDER,
THE FIFTY THOUSAND DOLLARS ($50,000.00) EARNEST MONEY WILL BE
IMMEDIATELY RETURNED TO LUBBOCK HERITAGE HOSPITAL, INC.

Wayne Collins
President
Lubbock Heritage Hospital, Inc.

# EXHIBIT "B"

WALLER LANSDEN DORTCH & DAVIS, LLP

NASHVILLE CITY CENTER
511 UNION STREET, SUITE 2700
NASHVILLE, TENNESSEE 37219-8966
(615) 244-6380
FAX: (615) 244-6804
www.wallerlaw.com

1901 SIXTH AVENUE NORTH, SUITE 1400
BIRMINGHAM, ALABAMA 35203-2623
(205) 214-6380

520 SOUTH GRAND AVENUE, SUITE 800
LOS ANGELES, CALIFORNIA 90071
(213) 362-3680

David E. Lemke
(615) 850-8655
david.lemke@wallerlaw.com

September 2, 2008

<u>**Via Email: mtarbox@mcjllp.com**</u>

Max Tarbox, Esq.
McWhorter, Cobb and Johnson, LLP
1722 Broadway
P.O. Box 2547
Lubbock, Texas 79408

Re:     **Lubbock, Texas—Highland Medical Center, L.P., Bk. No.,
        08-50202-11, United States Bankruptcy Court for the
        Northern District of Texas**

Dear Max:

Enclosed please find a proposed Asset Purchase Agreement ("APA")
that constitutes the bid of Northstar Hospital, LLC ("Northstar"), for the Assets (as
defined in the APA) of Lubbock, Texas—Highland Medical Center, L.P. ("Debtor").
The purchase price being offered for the Assets is $3 million, plus assumption of the
Assumed Liabilities, subject to the terms and conditions of the APA. The Assumed
Liabilities include the overpayment liabilities for Debtor's Medicare and Medicaid
provider agreements and numbers for the years 2006 through 2008 in the
approximate amount of $900,000. In addition to the written bid contained with this
letter, Northstar has also caused the amount of $50,000 to be wire transferred to
your firm's trust account as Northstar's earnest money deposit.

This bid and the earnest money deposit are being provided in
compliance with the "Bid Procedures" established by the Bankruptcy Court in that
Order entered in the above referenced case on August 15, 2008. However, in the
event the Bankruptcy Court were to determine that one or more provisions
contained in the APA resulted in Northstar's bid not being a "Qualified Bid" in

WALLER LANSDEN DORTCH & DAVIS, LLP

September 2, 2008
Page 2

compliance with the Bid Procedures, Northstar reserves the right to modify or eliminate any such provisions to the extent and degree necessary to cause the APA to be deemed a "Qualified Bid."

Please confirm timely receipt of this bid and the earnest money deposit. If you have any questions about this matter or the enclosed bid, please do not hesitate to contact me. Thank you.

Sincerely,

David E. Lemke

DEL/ct
Enclosure
cc:     George Goodwin
        Ken Mitchell
        Joe Sowell, Esq.
        Will Morrow, Esq.

.0

Accepted by Debtor as a "Qualified Bid," with changes contained herein, per Court Order.

/s/ Max R. Tarbox

Max Tarbox

Attorney for Debtor

/s/ David E. Lemke

David E. Lemke

Attorney for Northstar
Hospital, LLC

## PURCHASE AGREEMENT

by and among

## LUBBOCK, TEXAS – HIGHLAND MEDICAL CENTER, L.P.

and

## NORTHSTAR HOSPITAL, LLC

Dated as of September __, 2008

**TABLE OF CONTENTS**

Page

ARTICLE I - DEFINITIONS ...................................................................................... 3
   1.1    Definitions ............................................................................................... 3

ARTICLE II - SALE OF ASSETS AND CERTAIN RELATED MATTERS ........................... 10
   2.1    Sale of Assets ........................................................................................ 10
   2.2    Excluded Assets .................................................................................... 11
   2.3    Assumed Liabilities ............................................................................... 11
   2.4    Excluded Liabilities .............................................................................. 12
   2.5    Purchase Price ....................................................................................... 13
   2.6    Proration ............................................................................................... 14
   2.7    Interest .................................................................................................. 14

ARTICLE III - CLOSING .......................................................................................... 14
   3.1    Closing .................................................................................................. 14
   3.2    Actions of Seller at Closing .................................................................. 14
   3.3    Actions of Buyer at Closing .................................................................. 15
   3.4    Additional Acts ..................................................................................... 15

ARTICLE VI - COVENANTS OF SELLER. .................................................................. 16
   6.3    Negative Covenants. ............................................................................. 16
   6.4    Notification ........................................................................................... 16
   6.5    Regulatory Approvals ........................................................................... 16
   6.8    Closing Conditions ............................................................................... 17
   6.9    Seller's Cost Reports ............................................................................ 17
   6.13   Employee Benefit Plans ........................................................................ 17

ARTICLE VII - COVENANTS OF BUYER; ADDITIONAL AGREEMENTS ...................... 17
   7.3    Reserved for Employee Payables. ......................................................... 17
   7.5    Allocation of Purchase Price ................................................................. 17
   7.6    Post-Closing Access to Information ...................................................... 18
   7.7    Preservation and Access to Records After the Closing ......................... 18
   7.9    Misdirected Payments .......................................................................... 18
   7.10   Employee Matters ................................................................................ 19
   7.12   Holdback .............................................................................................. 19
   7.13   Executory Contracts ............................................................................. 20

ARTICLE VIII - CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER. ............... 20
   8.2    Schedules ............................................................................................. 20
   8.3    Pre-Closing Confirmations ................................................................... 20
   8.4    Action/Proceeding ................................................................................ 20
   8.5    Sale Order ............................................................................................. 21
   8.8    Title Policy and Survey ......................................................................... 21
   8.13   Closing Documents ............................................................................... 21

ARTICLE IX - CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER. ................ 21
   9.3    Action/Proceeding ................................................................................ 21
   9.4    Pre-Closing Confirmations ................................................................... 21

ARTICLE XII - INDEMNIFICATION. ........................................................................................ 22
    12.2    Indemnification by Seller.......................................................................................... 22
    12.3    Indemnification by Buyer ......................................................................................... 22
    12.7    Notice and Control of Litigation .............................................................................. 22

ARTICLE XIII - GENERAL. ..................................................................................................... 23
    13.1    Notices ....................................................................................................................... 23
    13.2    Public Announcements .............................................................................................. 23
    13.3    Public Relations ........................................................................................................ 24
    13.4    Expenses; Legal Fees and Costs ............................................................................... 24
    13.5    No Third-Party Beneficiary ...................................................................................... 24
    13.7    Choice of Law ........................................................................................................... 24
    13.8    Benefit/Assignment................................................................................................... 24
    13.9    Waiver of Breach ...................................................................................................... 24
    13.10   Severability ............................................................................................................... 24
    13.11   Divisions and Headings ............................................................................................ 25
    13.12   Drafting ..................................................................................................................... 25
    13.13   Entire Agreement/Amendment ................................................................................. 25
    13.14   Time of Essence ........................................................................................................ 25
    13.15   Waiver of Jury Trial ................................................................................................. 25
    13.16   Interpretation ............................................................................................................ 25
    13.17   Further Assurances.................................................................................................... 26

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (the "Agreement") is made and entered into as of September __, 2008, by and among **Northstar Hospital, LLC,** a Delaware limited liability company ("Buyer") and **Lubbock, Texas–Highland Medical Center, L.P.,** a Texas limited partnership ("Seller").

## W I T N E S S E T H:

**WHEREAS,** Seller owns and operates Highland Community Hospital, a 126-bed general acute care hospital and outpatient services facility located at 2412 50th Street, Lubbock, Texas and the related medical office buildings and other related real and personal property located in Lubbock, Texas (the "Hospital");

**WHEREAS,** On May 31, 2008, (the "Petition Date"), Seller commenced a voluntary case  (the "Bankruptcy Case") under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court").

**WHEREAS,** Seller desires to sell, and Buyer desires to buy, the fixed and operating assets owned and used by Seller in operation of the Hospital (the "Business"), and Buyer agrees to employ certain of the employees of Seller and to assume certain of the obligations of Seller under specified contracts from and after the Closing, on the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code (the "Transaction").

**WHEREAS,** Bankruptcy Court approval shall be required to consummate the Transaction.

**WHEREAS,** the Assets (as defined below) and the Assumed Liabilities (as defined below) include assets and liabilities of Seller which are to be purchased and assumed by Buyer pursuant to an order (or orders) of the Bankruptcy Court approving such sale (the "Sale Order") pursuant to sections 105, 363 and 365 of the Bankruptcy Code and applicable Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), which order will include the authorization for the assumption by Buyer of certain executory contracts and unexpired leases and the assignment of such executory contracts and unexpired leases to Buyer pursuant to section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code.

**NOW, THEREFORE,** for and in consideration of the premises, and the agreements, covenants, representations and warranties hereinafter set forth, and other good and valuable consideration, the receipt and adequacy all of which are forever acknowledged and confessed, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1**    **Definitions**.    Capitalized terms used in this Agreement shall have the following meanings:

"Accessibility Laws" means the Rehabilitation Act of 1973 and Title III of the Americans with Disabilities Act.

"Accounts Receivable" means all accounts and notes receivable of the Hospital existing at the Effective Time, including any accounts and notes receivable that have been charged off as bad debts.

"Affiliate" means any Person controlling, controlled by or under common control with the referenced Person.

"Agency Receivables" has the meaning set forth in Section 4.8(a).

"Agreement" has the meaning set forth in the Preamble.

"Allocation" has the meaning set forth in Section 7.5.

"Applicable Rate" means the prime rate as quoted in the Money Rates Section of *The Wall Street Journal* from time to time.

"Assets" has the meaning set forth in Section 2.1.

"Assigned Causes of Action" means Causes of Action (i) with respect to or arising out of any Assumed Contract; and (ii) arising with respect to property, plant and equipment included in the Assets, whether as a result of warranty or otherwise.

"Associate" means any officer or director of Seller or any member of the immediate family of such Person.

"Assumed Contracts" means, to the extent assignable by Seller and transferable to Buyer, (i) all Contracts listed in Schedule 4.12, other than those designated as Excluded Contracts and (ii) all Contracts assumed by Buyer in accordance with Section 6.6(a).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Balance Sheet Date" means July 31, 2008.

"Bankruptcy Case" has the meaning set forth in the Recitals.

"Bankruptcy Rules" has the meaning set forth in the Recitals.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Rules" shall have the meaning set forth in the Recitals.

"Benefit Plans" means "employee benefit plans," as defined in Section 3(3) of ERISA, all benefit plans as defined in Section 6039D of the Code and the rules and regulations promulgated thereunder, and all other stock purchase, stock option, equity-based, retention bonus, bonus, incentive compensation, deferred compensation, profit sharing, severance, change in control, supplemental unemployment, layoff, salary continuation, retirement, pension, health, life insurance, disability, group insurance, vacation, holiday, sick leave, fringe benefit, welfare and other employee benefit plans (whether oral or written,

qualified or non-qualified) and employment agreements, programs, policies or other arrangements and any trust, escrow or other funding arrangement related thereto.

"Business" shall have the meaning set forth in the Recitals.

"Business Associate Agreement" shall have the meaning set forth in Section 4.29(c).

"Buyer" has the meaning set forth in the Preamble.

"Buyer Indemnified Parties" means Buyer, its Affiliates, and the directors, governors, officers, members, shareholders, employees, successors, assigns, and representatives of any of the foregoing.

"Causes of Action" means any and all claims, demands, rights, defenses, counterclaims, suits or other actions and all other claims of any value whatsoever, whether known or unknown, in law, equity or otherwise, against any third party and the proceeds or benefits thereof.

"Claim" has the meaning set forth in 11 U.S.C. § 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 3.1.

"Closing Date" has the meaning set forth in Section 3.1.

"COBRA" means Section 4980 B of the code and Title I, Part 6 of ERISA.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidential Information" means all information of any kind concerning the Hospital obtained directly or indirectly from Seller in connection with the transactions contemplated by this Agreement except information (a) ascertainable or obtained from public or published information, (b) received from a third party not known by Buyer to be under an obligation to Seller to keep such information confidential, (c) which is or becomes known to the public (other than through a breach of this Agreement), or (d) which was in Buyer's possession prior to disclosure thereof to Buyer in connection herewith.

"Contracts" means all commitments, contracts, leases, subleases, licenses, sublicenses and other agreements of any kind relating to the Hospital, the Assets or the operation thereof to which Seller or any of its Affiliates is a party or by which any of the Assets are bound.

"Cost Report Receivables" has the meaning set forth in Section 2.2(h).

"Covered Entities" shall have the meaning set forth in Section 4.29(a).

"Damages" means losses, liabilities, damages, costs (including court costs and costs of appeal), Taxes and expenses (including reasonable attorney's fees).

"Effective Time" shall have the meaning set forth in Section 3.1.

"Employee Payables" means obligations and liabilities in respect to salaries, bonuses, severance other compensation, employee benefits (including health insurance claims incurred, whether or not reported or paid) and other payables due to Employees under the Benefit Plans or otherwise as of the Effective Time, including any obligations to pay for accrued but unused paid time off, accrued vacation, holidays and sick leave of Employees.

"Environmental Claim" means any claim, action, cause of action, investigation or notice by any person alleging potential liability (including potential liability for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries, or penalties) arising out of, based on or resulting from: (a) the presence, or release or threat of release into the environment, of any Materials of Environmental Concern at any location, whether or not owned or operated by Hospital or Seller; or (b) circumstances forming the basis of any violation or alleged violation of any Environmental Law.

"Environmental Laws" means, as they exist on the date hereof and as of the Effective Time, all applicable Laws relating to pollution or protection of human health (as relating to the environment or the workplace) and the environment (including ambient air, surface water, ground water, land surface or sub-surface strata), including Laws relating to emissions, discharges, releases or threatened releases of Materials of Environmental Concern, or otherwise relating to the use, treatment, storage, disposal, transport or handling of Materials of Environmental Concern, including, but not limited to Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq., Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., Occupational Safety and Health Act, 29 U.S.C. § 651 et seq. ("OSHA"), the Clean Air Act, 42 U.S.C. § 7401 et seq., the Clean Water Act, 33 U.S.C. § 1251 et seq., each as may have been amended or supplemented, and any applicable environmental transfer statutes or Laws.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means (a) any related company or trade or business that is required to be aggregated with Seller under Code Sections 414(b), (c), (m) or (o); (b) any other company, entity or trade or business that has adopted or has ever participated in any Benefit Plan related to Seller; and (c) any predecessor or successor company or trade or business of Seller.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" means (i) all Contracts listed in Schedule 4.12 that are designated as "excluded", (ii) all Contacts not listed in Schedule 4.12, and (iii) all Contracts that Buyer has not elected to assume pursuant to Section 6.6.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Federal Privacy Regulations" means the regulations contained in 45 C.F.R. Parts 160 and 164, as amended.

"Federal Transaction Regulations" means the regulations contained in 45 C.F.R. Parts 160 and 162, as amended.

"Financial Statements" has the meaning set forth in Section 4.4(a).

"Governmental Authority" means the government of the United States and any government of a state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, commission or instrumentality of the United States, any state of the United States or any political subdivision thereof, any tribunal or arbitrator(s) of competent jurisdiction and any self-regulatory organization.

"Government Patient Receivables" means accounts receivable from rendering services and provision of medicine, drugs and supplies to patients relating to Medicare, Medicaid, TRICARE and other governmental third party payors.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, as codified at 42 U.S.C. Sections 1320d through d-8.

"Holdback" means the sum of $750,000, which Buyer will hold back from the Purchase Price at closing to satisfy Debtor's obligations (a) for Medicare, Medicaid, or Tri-Care liabilities that exceed $100,000 for the 2008 Cost Report, and (b) for any amounts payable to HMS in order to obtain use of the billing software, as well as any other indemnity obligations of Seller under Section 12.2.

"Hospital" has the meaning set forth in the Recitals.

"Indemnified Party" has the meaning set forth in Section 12.7.

"Indemnifying Party" has the meaning set forth in Section 12.7.

"Interest Commencement Date" has the meaning set forth in Section 2.7.

"Inventory" means inventories of usable supplies, drugs, food, janitorial and office supplies and other disposables and consumables existing at the Effective Time and located at the Hospital or purchased by Seller for use in connection with the Hospital.

"Law" means any statute, rule, regulation, code, ordinance, resolution, order, writ, injunction, judgment, decree, ruling, promulgation, policy, treaty directive, interpretation, or guideline adopted or issued by any Governmental Authority.

"Legal Requirements" means all applicable Laws, corporate integrity agreements and other requirements of or agreements with all Governmental Authorities having jurisdiction over the Hospital or the operations of the Hospital.

"Licenses" means all rights, to the extent assignable or transferable, to all licenses, certificates of need, certificates of exemption, franchises, accreditations and registrations, permits, approvals, consents and all applications thereof and waivers of any requirements pertaining thereto, if any, and other licenses or permits issued in connection with the ownership, operation or development of any portion of the Business.

"Lien" means any mortgage, pledge, hypothecation right of offer, Claim, occupancy agreement, covenant, encroachment, burden, title defect, voting trust agreement, right of first refusal, charge, assessment, security interest, lease, sublease, lien, right of set-off, right of recoupment, adverse claim, levy, charge, easement (or other matter which would affect title to the Real Property or the use or

possession thereof or otherwise be disclosed by an ALTA/ACSM Land Title Survey, including all optional items from Table A), restriction, license or other encumbrance of any kind, or any conditional sale contract, title retention contract, or other contract to give or to refrain from giving any of the foregoing.

"Material Adverse Effect" means any event, occurrence, fact, condition, change or effect that (i) is, or is reasonably likely in the future to be, individually or in the aggregate, materially adverse to the business, operations, prospects, results of operations, condition (financial or otherwise), properties (including intangible properties), rights, obligations or Assets of Seller or the Hospital or (ii) materially impairs or delays, or is reasonably likely to materially impair or delay, the ability of Seller to consummate the transactions contemplated by this Agreement or to perform its obligations under this Agreement.

"Materials of Environmental Concern" means chemicals, pollutants, contaminants, hazardous materials, hazardous substances and hazardous wastes, medical waste, toxic substances, petroleum and petroleum products and by-products, asbestos-containing materials, PCBs, and any other chemicals, pollutants, substances or wastes, in each case so defined, identified, or regulated under any Environmental Law.

"Order" means a judgment, order, writ, injunction, decree, determination, or award of any Governmental Authority.

"PCBs" means polychlorinated biphenyls.

"Permitted Encumbrances" means (i) lease obligations that are Assumed Contracts, (ii) zoning, land use and environmental regulations of Governmental Authorities, provided that such regulations have not been violated, and (iii) items listed on Exhibit A and approved in writing by Buyer.

"Personal Property" means all tangible and intangible personal property used or held for use in connection with the Business, including all equipment, furniture, fixtures, machinery, vehicles, office furnishings, instruments, leasehold improvements, spare parts, and, to the extent assignable or transferable by Seller (or its Affiliates), all rights in all warranties of any manufacturer or vendor with respect thereto.

"PIP" has the meaning set forth in Section 7.8(b)(i).

"Proceeding" means any arbitration, audit, hearing, investigation, litigation suit or other similar action by or before a Governmental Authority.

"Programs" has the meaning set forth in Section 4.8(a).

"Purchase Price" has the meaning set forth in Section 2.5(a).

"Qualified Beneficiaries" means any current or former employee of Seller (including any eligible spouse and dependent thereof) who incurs a qualifying event prior to or as of the Effective Time within the meaning of Section 4980B of the Code.

"Real Property" means all fee, leasehold and other interests in real property owned by Seller, whether directly or indirectly, or otherwise used or held for use in connection with the Hospital, together with all buildings, improvements and fixtures and construction in progress located thereupon and all appurtenances, rights of way and air, mineral or other rights related thereto.

"Reference Balance Sheet" has the meaning set forth in Section 4.4(a)(i).

"Required Consents" has the meaning set forth in Section 4.17.

"Sale Order" has the meaning set forth in the Recitals.

"Seller" has the meaning set forth in the Preamble.

"Seller Cost Reports" has the meaning set forth in Section 6.9.

"Seller Indemnified Parties" means Seller and the directors, governors, officers, members, shareholders, employees, Affiliates, successors, assigns, and representatives of Seller.

"Straddle Patients" has the meaning set forth in Section 7.8(b)(ii).

"Survey" has the meaning set forth in Section 8.8(b).

"Surveyor" has the meaning set forth in Section 8.8(b).

"Survival Period" has the meaning set forth in Section 12.1.

"Taxes" means (i) any and all federal, state, local, foreign and other net income, gross income, gross receipts, sales, use, ad valorem, unclaimed property, transfer, franchise, profits, license, lease, rent, service, service use, withholding, payroll, employment, excise, severance, privilege, stamp, occupation, premium, property, windfall profits, alternative minimum, estimated, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts with respect thereto, (ii) any liability for payment of amounts described in clause (i) as a result of transferee liability or otherwise through operation of law, and (iii) any liability for the payment of amounts described in clauses (i) or (ii) as a result of any tax sharing, tax indemnity or tax allocation agreement or any other express or implied agreement to indemnify any other Person; and

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Title Agent" has the meaning set forth in Section 8.8(a).

"Title Commitment" has the meaning set forth in Section 8.8(a).

"Title Company" has the meaning set forth in Section 8.8(a).

"Title Policy" has the meaning set forth in Section 8.8(a).

"TJC" means The Joint Commission formerly known as the Joint Commission on Accreditation of Health Care Organizations.

"Transaction" has the meaning set forth in the Recitals.

"Transaction Documents" means this Agreement, and all other agreements and instruments executed and delivered by the respective parties in connection with this Agreement.

"Transfer Taxes" means recording fees, transfer fees, transfer taxes, sales taxes, documentary or stamp taxes and regulatory filing fees.

"Transition Patients" has the meaning set forth in Section 7.8(a).

"Transition Services" has the meaning set forth in Section 7.8(a).

"WARN Act" means the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101-2109.

## ARTICLE II
## SALE OF ASSETS AND CERTAIN RELATED MATTERS

**2.1    Sale of Assets**. At the Closing, Seller shall sell, transfer, convey, assign and deliver to Buyer, and Buyer shall purchase from Seller, all assets, real, personal and mixed, tangible and intangible, associated with or employed or held for use in the Business other than the Excluded Assets (collectively, the "Assets"). Without limiting the foregoing, the Assets will include the following:

(a)    the Real Property;

(b)    the Personal Property;

(c)    the Licenses;

(d)    the Assumed Contracts and Assigned Causes of Action;

(e)    Prepaid Expenses and any deposits related to Assumed Contracts or the Assets;

(f)    except as provided in Section 2.2(c), all Inventory;

(g)    Seller's Medicare, Medicaid, TRICARE and other governmental third party payor provider agreements and any associated provider numbers, as well as any other government recognized numbers (including, if appropriate, Seller's federal employer identification number) that are necessary for Buyer to use the foregoing agreements;

(h)    the Healthcare Management Systems, Inc. billing software used in connection with the Business and all documents, records, operating manuals and files, and computer software owned or licensed by Seller or its Affiliates, pertaining to or used in connection with the Hospital, including all patient records, medical records, personnel records, financial records, equipment records, construction plans and specifications, medical and administrative libraries, but excluding Seller's corporate record books, minute books, tax records and, where prohibited by law, restricted patient and medical records;

(i)    Seller's rights to the name "Highland Medical Center" and all variations thereof; all patents, patent applications, trade names, trademarks, service marks, trade secrets, copyrights and other intellectual property owned by Seller; and all of Seller's rights to use all patents, patent applications, trade names, trademarks, service marks, trade secrets, copyrights and other intellectual property of other Persons;

(j)     Seller's insurance proceeds to the extent provided in <u>Section 8.17</u>;  and

(k)     except as expressly excluded above, all other property owned by Seller, whether tangible or intangible, located at the Hospital or used in connection with the Hospital whether or not reflected on the balance sheet of Seller (including any claims against third parties by Seller relating to the Assets whether known or unknown, contingent or otherwise).

The Assets, together with the Excluded Assets, comprise all of the property and assets used in the conduct and operation of the Hospital as of the date of this Agreement.  The Assets also include all assets acquired by Seller between the Balance Sheet Date and the Closing.  Seller shall convey good and marketable title to the Assets, and all parts thereof to Buyer free and clear of all Liens except Permitted Encumbrances.

     **2.2**     **Excluded Assets**.  The following items which are related to the Assets are not intended by the parties to be a part of the sale and purchase contemplated hereunder and are excluded from the Assets (collectively, the "<u>Excluded Assets</u>"):

(a)     restricted and unrestricted cash and cash equivalents, including cash, cash accounts, marketable securities and certificates of deposit, and including any such cash or cash equivalents which are derived from gifts, grants, bequests and donations held in trust for charitable purposes;

(b)     the Accounts Receivable;

(c)     all Inventory disposed of or exhausted prior to the Effective Time in the ordinary course of business;

(d)     items of personal property transferred or disposed of in accordance with <u>Section 6.3(a)(iv)</u>;

(e)     all assets, rights and funds in connection with any plan described in <u>Section 4.20</u>;

(f)     all of Seller's insurance proceeds arising in connection with the Hospital prior to the Closing, except to the extent provided in <u>Section 8.17</u>;

(g)     the Excluded Contracts;

(h)     the rights to settlements and retroactive adjustments, if any, whether arising under any Seller Cost Report, whether open or closed, arising from or against the United States government or any state government under the terms of the Medicare, Medicaid and TRICARE programs, and against any third-party payor programs which settle upon a basis other than an individual claims basis ("<u>Cost Report Receivables</u>"); and

(i)     Seller's corporate record books, minute books and tax records, and any other records which Seller is required to retain by Law  (copies of which shall be given to Buyer), but only to the extent that such books and records cannot be transferred to Buyer if Buyer agrees to grant Seller access to such books and records and to maintain them for the period required by Law.

     **2.3**     **Assumed Liabilities**.  As of Closing, Buyer agrees to assume the future payment and performance of the following liabilities of Seller (collectively, the "<u>Assumed Liabilities</u>"):

(a) Overpayment liabilities associated with Seller's Medicare and Medicaid provider agreements and numbers for cost report years 2006, 2007, and 2008 through Closing (net of any set-off or recoupment against Accounts Receivable for Medicare or Medicaid liabilities), subject to the provisions in Section 12.2(d).

(b) Obligations arising out of and relating to the period after the Closing under the Assumed Contracts, provided, however, that such Assumed Contracts shall have been assumed and assigned to Buyer in accordance with Section 365 of the Bankruptcy Code.

(c) Except as otherwise provided in Section 2.3(a) above, Buyer shall not be liable for (i) any claims arising from Seller's assignment and Buyer's assumption of the Assumed Liabilities, (ii) uncured defaults in performance of the Assumed Liabilities for periods prior to Closing, and/or (iii) unpaid amounts in respect of the Assumed Liabilities that are past due as of Closing in accordance with the terms of the obligation and not accrued on the books of Seller.

2.4    **Excluded Liabilities**. It being expressly agreed that the sale of the Assets shall be free and clear of all Liens, Claims and Encumbrances to the fullest extent of Section 363 of the Bankruptcy Code, except as expressly provided to the contrary in Section 2.3 above, under no circumstance shall Buyer be obligated to pay or assume, and none of the Assets shall be become liable for or subject to, any liability of Seller and/or its Affiliates, whether fixed or contingent, recorded or unrecorded, known or unknown, and whether or not set forth on the Schedules hereto, including the following (collectively, the "Excluded Liabilities"):

(a) any obligation or liability accruing, arising out of, or relating to acts or omissions of any Person in connection with the Assets or the operation of the Business prior to the Closing;

(b) any obligation or liability accruing, arising out of, or relating to any act or omission by Seller, any of its Affiliates or any of their respective employees, medical staff, agents, vendors or representatives, before or after the Closing;

(c) any obligation or liability accruing, arising out of, or relating to any breach of or default under any Assumed Contract by Seller or any of its Affiliates prior to Closing other than liabilities addressed by Section 7.13;

(d) any obligation or liability accruing, arising out of, or relating to any Excluded Contract;

(e) any liability or obligation for the Employee Payables or for severance with respect to employees of Seller or its Affiliates;

(f) any obligation or liability accruing, arising out of, or relating to any federal, state or local investigations, claims or actions representatives with respect to acts or omissions (or suspected or alleged acts or omissions) of Seller, any of its Affiliates or any of their respective employees, medical staff, agents, vendors prior to the Closing; provided, however, that nothing in this Section shall be deemed to be a waiver by any Governmental Authority of its rights to bring criminal actions or seek criminal penalties in connection with such actions;

(g) any obligation or liability accruing, arising out of, or relating to any acts or omissions of Seller, any of its Affiliates or any of their respective directors, officers, employees and agents claimed to violate any Laws;

(h) any liabilities of Seller or any of its Affiliates for (i) capital lease obligations and other similar liabilities or guarantees of Seller, (ii) indebtedness for borrowed money, and (iii) accounts payable and other current liabilities;

(i) except as otherwise provided in Section 2.3(a) above, any liabilities or obligations of Seller or any of its Affiliates of every kind and nature, known and unknown, arising under the terms of the Medicare, Medicaid, TRICARE or any other third-party payor programs or health insurers, in respect of, arising out of or as a result of (i) periods prior to and up to the Closing, or (ii) the consummation of the transactions contemplated hereby, including claims, setoffs or recoupments for overpayments or other excessive reimbursement or non-covered services or any penalties or sanctions relating thereto; and (iii) any liability of Seller under, arising prior to or relating to any period prior to the Closing from any risk pools and other risk sharing agreements established in connection with any managed care contract assumed by Buyer hereunder;

(j) (i) all liabilities or obligations for Taxes of or assessments against Seller or its Affiliates in respect of any period (or portion thereof) ending on or prior to the Closing Date or resulting from the consummation of the transactions contemplated hereby, (ii) all liabilities or obligations for Taxes relating to the operation of the Hospital or the ownership of the Assets for any period (or portion thereof) ending on or prior to the Closing Date, and (iii) all Transfer Taxes, if any, relating to the sale and the transactions provided for hereby;

(k) (i) except to the extent such liabilities are expressly assumed by Buyer in accordance with Section 2.3, any liability with respect to Seller's employees relating to periods prior to the Closing, including liability for (A) the Benefit Plans and any other compensation, benefits, pension, profit sharing, deferred compensation, or health and welfare benefit plans, paid time off, liability for any EEOC claim, wage and hour claim, unemployment compensation claim or workers' compensation claim or personnel policy, including those relating to any termination of employment; or (B) any payroll taxes; or (ii) any liability arising under the WARN Act;

(l) liabilities for expenses incurred by Seller incidental to the preparation of this Agreement, the preparation or delivery of materials or information requested by Buyer, or the consummation of the transactions contemplated hereby, including all broker, counsel and accounting fees or any account payable which is attributable to legal and accounting fees and similar costs incurred by Seller which are directly related to the sale of any of the Assets;

(m) liabilities arising from or in connection with (i) any Order of any Governmental Authority, (ii) the violation of any Law, or (iii) the violation of any Medicare, Medicaid or TRICARE program integrity or compliance agreement involving Seller or relating to or arising in connection with the use, operation, ownership or possession of the Assets;

(n) liabilities attributable to any of the Excluded Assets; and

(o) any other liability, fixed or contingent, known or unknown, relating to or arising out of the ownership, operation or use of the Business or the Assets prior to the Closing.

**2.5** **Purchase Price**

(a) The consideration to be paid by Buyer for the Assets (the "Purchase Price") shall be $3,000,000, plus the Assumed Liabilities.

(b)     The amount of cash to be delivered at Closing in accordance with Section 3.3(a) shall be equal to (i) $3,000,000, minus (ii) the Holdback (to be administered in accordance with Section 7.12).

**2.6     Proration**.  Within ninety (90) days after the Closing Date, Seller and Buyer shall prorate as of the Effective Time, any amounts which become due and payable after the Effective Time with respect to (i) the Contracts, (ii) all utilities servicing any of the Assets, including without limitation, water, sewer, telephone, electricity and gas service, and (iii) any ad valorem, real or personal property taxes.

**2.7     Interest**.  Unless otherwise provided herein to the contrary, any payment required to be made by any party pursuant to this Agreement, if not paid before five business days after the date such payment is required to be made hereunder (the "Interest Commencement Date"), shall include interest from the Interest Commencement Date to the day such payment is made, computed at the Applicable Rate plus two percent.  All requests for payment pursuant to this Section 2.7 shall be accompanied by a certificate of an officer of the party entitled to receive such payment setting forth the amount of the payment due pursuant to this Agreement (without regard to any amounts payable through operation of this Section 2.7) and the applicable Interest Commencement Date.

**ARTICLE III**
**CLOSING**

**3.1     Closing**.  The closing of the purchase of the Assets by Buyer (the "Closing") shall occur on the date (the "Closing Date") specified in the Sale Order at the offices of McWhorter, Cobb & Johnson, LLP, 1722 Broadway, Lubbock, TX, at 10:00 a..m. local time the Closing Date.  The Closing shall be deemed to occur at 12:01 a.m., Central Time, on the day immediately following the Closing Date or at such other time as shall be mutually agreed upon in writing by the parties hereto (the "Effective Time").

**3.2     Actions of Seller at Closing**.  At the Closing and unless otherwise waived in writing by Buyer, Seller shall deliver to Buyer the following:

(a)     A Trustee deed or deeds, fully executed by Seller in recordable form, conveying to Buyer good and marketable fee simple title to the Real Property, free and clear of any Lien, easement, restriction of record, including any use restriction, or other encumbrance, except for the Permitted Encumbrances, and/or Assignments fully-executed by Seller in recordable form assigning to Buyer leasehold title to any Real Property which is a leasehold estate, subject only to Permitted Encumbrances;

(b)     A final, non-appealable Sale Order authorizing and approving the Transactions, including the sale of the Assets free and clear of all Liens, claims, encumbrances and interests, other than Permitted Encumbrances, to the fullest extent permitted by 11 U.S.C. §363(b) and (f), and assumption and assignment of the Assumed Contracts to the fullest extent permitted by 11 U.S.C. §365.

(c)     A bill of sale and Assignment, fully executed by Seller, in substantially the form attached as Exhibit C hereto, conveying to Buyer good and marketable title to all tangible assets which are a part of the Assets and valid title to all intangible assets which are a part of the Assets, free and clear of all Liens other than the Permitted Encumbrances;

(d)     One or more assignment and assumption agreements (as reasonably requested by Buyer), fully executed by Seller, in substantially the form attached as Exhibit D hereto, conveying to

Buyer all of Seller's right, title and interest in, to and under the Assumed Contracts and certifying that all defaults, if any, with respect to the Assumed Contracts have been cured by Seller;

    (e) The Title Policy as described in and provided by <u>Section 8.8(a)</u> hereof;

    (i) A Certificate of existence and good standing of Seller from the State of **[Texas]** dated the most recent practical date prior to Closing;

    (j) All duly executed original CMS forms necessary for filing with the Medicare Program for the acquisition; and

    (k) Such other instruments and documents as are reasonably necessary to satisfy the conditions precedent to Buyer's obligations hereunder and such other instruments and documents as Buyer reasonably deems necessary to effect the transactions contemplated hereby; and

  **3.3** <u>**Actions of Buyer at Closing**</u>.  At the Closing and unless otherwise waived in writing by Seller, Buyer shall deliver to Seller the following:

    (a) An amount equal to the Initial Purchase Price, less the Holdback, in immediately available funds;

    (b) A bill of sale and assignment, fully executed by Buyer, in the form attached as <u>Exhibit C</u> hereto;

    (c) One or more assignment and assumption agreements (as reasonably determined by Buyer), fully executed by Buyer, in the form attached as <u>Exhibit D</u> hereto;

    (d) Copies of resolutions duly adopted by the governing body of Buyer authorizing and approving Buyer's performance of the transactions contemplated hereby and the execution and delivery of this Agreement and the documents described herein, certified as true and in full force as of Closing by an appropriate officer of Buyer;

    (e) Certificates of the President or a Vice President of Buyer certifying that each and all of the conditions set forth in <u>Article IX</u> has been satisfied;

    (f) Certificates of incumbency for the respective officers of Buyer executing this Agreement or making certifications for Closing or executing agreements or instruments contemplated hereby dated as of Closing;

    (g) A certificate of existence and good standing of Buyer from Delaware, dated the most recent practical date prior to Closing; and

    (h) Such other instruments and documents as Seller reasonably deems necessary to effect the transactions contemplated hereby.

  **3.4** <u>**Additional Acts**</u>.

    (a) From time to time after Closing, Seller shall execute and deliver such other instruments of conveyance and transfer, and take such other actions as Buyer reasonably may request, to convey and transfer more effectively full right, title and interest to, vest in, and place Buyer in legal and actual possession of, any and all of the Assets.

(b)     Seller and Buyer shall cooperate with and use their respective best efforts to have their respective former and present directors, officers and employees cooperate with each other party on and after Closing in furnishing information, evidence, testimony and other assistance in connection with any action, Proceeding, arrangement or dispute of any nature with respect to matters pertaining to all periods prior to Closing in respect of the items subject to this Agreement.

## ARTICLE VI
## COVENANTS OF SELLER

**6.3     Negative Covenants**.

(a)     From the date hereof to the Closing Date, neither Seller nor its Affiliates will, in respect of the Hospital:

(i)     amend or terminate any of the Assumed Contracts, enter into any new Contract, or incur or agree to incur any liability, except in the ordinary and regular course of business, and in no event shall Buyer take any such action if the amount to be paid or received under any such Contract or commitment exceeds $5,000 or, Contract or commitment cannot be fully performed or terminated without penalty within 90 days following Closing;

(iii)    increase compensation or benefits payable or to become payable or make a bonus payment to or otherwise enter into one or more bonus agreements with any employee or agent, except in the ordinary course of business in accordance with existing personnel policies;

(iii)    create, assume or permit to exist any new Lien upon any of the Assets, whether now owned or hereafter acquired;

(iv)    sell, assign or otherwise transfer or dispose of any property, plant or equipment (other than supplies), except in the ordinary and regular course of business with comparable replacement thereof;

(v)     take any action outside the ordinary and regular course of business.

(b)     Seller and its Affiliates will not take or omit to take any action which would cause or permit Seller or an Affiliate to violate any covenant of Seller set forth in this Agreement.

**6.4     Notification.**  Seller shall notify Buyer in writing of any Material Adverse Effect in the financial position or earnings of the Hospital after the date hereof and prior to the Closing and any unexpected emergency or other unanticipated adverse change in the Hospital and of any Governmental Authority complaints, investigations or adjudicatory proceedings (or communications indicating that the same may be contemplated) or of any other such matter and shall (i) keep Buyer fully informed of such events, (ii) permit its representatives to participate in all discussions relating thereto.

**6.5     Regulatory Approvals.**  Between the date of this Agreement and the Closing Date, Seller will (a) use its best efforts to obtain as promptly as practicable, all approvals, authorizations and clearances of Governmental Authorities, required to consummate the transactions contemplated hereby, (b) provide such other information and communications to such Governmental Authorities as they may reasonably request, and (c) cooperate with Buyer in obtaining, as soon as practicable, all approvals, authorizations and clearances of Governmental Authorities required of Buyer to consummate the transactions contemplated hereby.

**6.8**    **Closing Conditions**.  Between the date of this Agreement and the Closing Date, Seller will use its best efforts to cause the conditions specified in Articles VIII and IX hereof over which Seller or any of its Affiliates has control to be satisfied as soon as reasonably practicable, but in all events on or before the Closing Date.

**6.9**    **Seller's Cost Reports**.  Seller shall be responsible for the preparation and timely filing of all cost reports relating to Seller for periods ending on or prior to the Closing Date or required as a result of the consummation of the transactions set forth herein, including terminating cost reports for the Medicare, Medicaid and TRICARE programs (the "Seller Cost Reports").   In the event that Seller requests Buyer's assistance in the preparation of the Seller Cost Reports, (i) Seller will cooperate with Buyer and provide Buyer all information and materials in Seller's possession requested by Buyer in respect of preparation of the Seller Cost Reports, (ii) Buyer agrees to cooperate with Seller and to provide assistance in the preparation of the Seller Cost Reports, and (iii) Seller acknowledges and agrees that all representations and warranties contained herein may continue to be fully and completely relied upon by Buyer notwithstanding (x) any material reviewed or knowledge acquired by Buyer in the course of preparation of the Seller Cost Reports that was not previously known to Buyer and (y) any information included in such Seller Cost Report.  Seller acknowledges that Buyer will have no responsibility for the content of the Seller Cost Reports, and that Buyer will not execute or otherwise assume responsibility for such Seller Cost Reports.  In any event, Buyer will use Buyer's reasonable best efforts to forward to Seller any and all correspondence relating to Seller Cost Reports or the Agency Receivables (which shall mean all net amounts due or to become due to Seller under the Medicare, Medicaid and TRICARE programs in respect of periods ending prior to or on the Closing Date) within five business days after receipt by Buyer.  Buyer shall remit any receipts of funds relating to Seller Cost Reports promptly after receipt by Buyer and shall forward to Seller any demand for payments within five (5) business days after receipt by Buyer.  Seller shall retain all rights to agency settlements and to Seller Cost Reports including any amounts receivable or payable in respect of such reports or reserves relating to such reports.  Such rights shall include the right to appeal any Medicare determinations relating to agency settlements and Seller Cost Reports.  Seller shall retain the originals of Seller Cost Reports, correspondence, work papers and other documents relating to Seller Cost Reports and the agency settlements.  Seller shall furnish copies of such documents to Buyer prior to the Closing to the extent then existing.

**6.10**    **Employee Benefit Plans**  Notwithstanding anything herein to the contrary, Seller, at its sole expense, shall: (i) terminate the Benefit Plans sponsored, maintained or contributed to by Seller effective as of the Closing Date; (ii) fully vest the accounts of Seller's employees in any Benefit Plans that are qualified plans under Section 401(a) of the Code; (iii) provide such employees the right to receive a distribution of such accounts thereafter; (iv) adopt all necessary resolutions and amendments to effectuate the foregoing; (v) provide all required notices to participants and appropriate governmental authorities; and (vi) provide to Buyer reasonably satisfactory evidence of such actions.


## ARTICLE VII
## COVENANTS OF BUYER; ADDITIONAL AGREEMENTS

**7.3**    **Reserve for Employee Payables.**    Seller shall treat the Employee Payables as an administrative claim in the Bankruptcy Case payable from the accounts receivable.

**7.5**    **Allocation of Purchase Price**.  The parties agree that Buyer shall prepare an allocation of the Purchase Price (and all other capitalized costs) among the Assets in accordance with Section 1060 of the Code and the Treasury Regulations thereunder (and any similar Law, as appropriate) (the

"Allocation"). Buyer shall deliver the Allocation to Seller within 180 days after the Closing. Buyer and Seller, and their respective Affiliates, shall report, act and file all Tax Returns (including, but not limited to Internal Revenue Service Form 8594), Medicare cost reports and other information filings, to the extent required, in all respects and for all purposes consistent with such Allocation. Neither Buyer nor Seller shall take any position (whether in audits, Tax Returns, or otherwise) which is inconsistent with such Allocation, unless required to do so by applicable Law. Notwithstanding the foregoing, creditors of the Seller shall be entitled review and copy Buyer's allocation of the purchase price, and while such allocation shall be binding on the Buyer and Seller for tax and accounting purposes, nothing in this paragraph shall prevent any creditor of the Seller from seeking a different allocation of the proceeds of the purchase price from the Bankruptcy Court for purposes of determining that creditor's rights to distribution from the Seller's bankruptcy estate

**7.6    Post-Closing Access to Information**.  Seller and Buyer acknowledge that subsequent to Closing each party may need access to information or documents in the control or possession of the other party for the purposes of concluding the transactions herein contemplated, audits, compliance with governmental requirements and regulations, and the prosecution or defense of third-party claims. Accordingly, Seller and Buyer agree that until the later of the seventh anniversary of the Effective Time or the expiration of any applicable statute of limitations pertaining to Medicare, Medicaid, TRICARE or tax matters, to the extent permitted by Law each shall make reasonably available to the other's agents, independent auditors and/or governmental agencies upon written request and at the expense of the requesting party such documents and information as may be available relating to the Assets for periods prior and subsequent to Closing to the extent necessary to facilitate concluding the transactions herein contemplated, audits, compliance with governmental requirements and regulations and the prosecution or defense of claims. In addition, Seller shall make available to Buyer, at Buyer's cost and expense, upon reasonable notice and during normal business hours, Seller's books and records to the extent not transferred to Buyer but necessary or of assistance to Buyer in the preparation of cost reports, financial records, Tax Returns or like matters.

**7.7    Preservation and Access to Records After the Closing**.  After the Closing, Buyer shall, in the ordinary course of business and as required by Law, keep and preserve all medical records and other records of the Hospital, including personnel records required under 29 CFR §1910.1030(h) relating to exposure to blood borne pathogens, as existing and delivered to Buyer as of the Closing and which constitute a part of the Assets delivered to Buyer at Closing. Buyer acknowledges that as a result of entering into this Agreement and operating the Hospital it will gain access to patient and other information which is subject to rules and regulations concerning confidentiality. Buyer agrees to abide by any such rules and regulations relating to the Confidential Information it acquires. Buyer agrees to maintain the patient records delivered to Buyer at Closing at the Hospital and offsite storage facilities after Closing in accordance with Law, and requirements of relevant insurance carriers, all in a manner consistent with the maintenance of patient records generated at the Hospital after Closing; provided, however, nothing herein is intended to prevent Buyer from moving any such records to a location of its choice after Closing so long as the records are properly maintained as provided above. Upon reasonable notice, during normal business hours, at Seller's sole cost and expense and upon Buyer's receipt of appropriate consents and authorizations, Buyer shall afford to the representatives of Seller, including its counsel and accountants, full and complete access to, and, as reasonably requested, copies of, the records transferred to Buyer at the Closing (including access to patient records in respect of patients treated by Seller at the Hospital). Any access to the Hospital, its records or Buyer's personnel granted to Seller in this Agreement shall be upon the condition that any such access not materially interfere with the business operations of Buyer.

**7.9    Misdirected Payments**.  Seller and Buyer covenant and agree to remit to the other within five business days of receipt any payments received, which payments are on or in respect of accounts or

notes receivable owned by (or are otherwise payable to) the other. In addition, in the event of a determination by any governmental or third-party payor that payments to Seller or the Hospital resulted in an overpayment or other determination that funds previously paid by any program or plan to Seller or the Hospital must be repaid, Seller shall be responsible for repayment of said monies (or defense of such actions) if such overpayment or other repayment determination was for services rendered prior to the Effective Time and Buyer shall be responsible for repayment of said moneys (or defense of such actions) if such overpayment determined was for services rendered after the Effective Time. In the event that, following Closing, Buyer suffers any offsets against reimbursement under any third-party payor or reimbursement programs due to Buyer relating to amounts owing under any such programs by Seller or any Affiliate of Seller, Seller shall upon written demand from Buyer within five business days pay to Buyer the amounts so billed or offset.

**7.10** **Employee Matters**.

(a)     As of the Effective Time, Seller shall terminate all of the employees at the Hospital that are listed on Schedule 7.10, and Buyer shall offer employment commencing as of the Effective Time to substantially all individuals listed on Schedule 7.10 at levels of compensation, benefits and seniority comparable to similarly situated employees of Buyer; provided, however, Buyer reserves the right not to hire any listed individual consistent with Buyer and its Affiliates' customary policies and procedures. Seller shall retain all liability in respect of all prior acts or omissions in respect of the Benefit Plans (whether or not disclosed herein and including administrative and funding activities and compliance with applicable Law), including all Employee Payables, and in respect of any curative action required to be taken in connection with the termination of such Benefit Plans.

(b)     For qualifying events occurring prior to the Closing Date, Seller shall provide continuation coverage required by COBRA and retain all liability in respect of such coverage, and Seller shall continue to have responsibility for such continuation coverage after the Closing Date.

**7.12** **Holdback**. At the Closing, the Holdback fund shall be established and maintained as follows:

(a)     The Holdback funds shall be deposited with Buyer, to be held and distributed in accordance with the terms of this Agreement;

(b)     The Holdback shall accrue interest from the date hereof to the date of disbursement at a rate equal to the monthly average of the prime rate, as listed in the Wall Street Journal, for the twelve month period ending on the date of disbursement; provided, however, that Seller shall only be paid interest with respect to Holdback amounts actually delivered to Seller after settlement of any claims against the Holdback pursuant to this Agreement;

(c)     Buyer shall, immediately upon giving written notice to Seller of the reason for such claim, be entitled to draw funds from the Holdback to pay, settle or offset amounts due from Seller pursuant to this Agreement. In the event that Seller disputes such use of Holdback funds in writing delivered to Buyer within 10 days of such notice, stating a reasonably detailed explanation of such dispute, and the dispute is resolved in Seller's favor, Seller's sole remedy shall be reinstatement of Holdback funds and lost interest since the date of the claim;

(d)     Buyer shall, on the one year anniversary of the Closing Date, disburse all remaining funds from the Holdback, together with accrued interest on such remaining Holdback funds, net of any amounts in respect of then-existing claims against the Holdback, to Seller as directed in written

instructions from Seller. Any funds held beyond such date shall be paid to Buyer or disbursed, as appropriate, following resolution of the relevant dispute.

**7.13 Executory Contracts.** Buyer shall cure obligations as of the Closing Date with respect to Assumed Contracts pursuant to Section 365(b)(1)(A) up to any amount of $170,000; provided, however, that any cure amount due to Healthcare Management System, Inc., in respect of the billing software shall be addressed out of the Holdback, and shall be in addition to the $170,000 cure amount under this provision.

## ARTICLE VIII
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

The obligations of Buyer hereunder are subject to the satisfaction, on or prior to the Closing Date, of the following conditions unless waived in writing by Buyer:

**8.2 Schedules.** Buyer shall have received from Seller a complete and final set of Schedules to this Agreement that are acceptable to Buyer in Buyer's sole discretion.

**8.3 Pre-Closing Confirmations.** Buyer shall have obtained documentation or other evidence reasonably satisfactory to Buyer that Buyer has:

(a) received approval from all Governmental Authorities whose approval is required to complete the transactions herein contemplated, including any planning approvals;

(b) received confirmation from the Texas Department of State Health Services as to hospital licensure matters and reasonable confirmation from all other applicable Governmental Authorities that upon Closing all licenses and permits required by Law to operate each component of the Hospital as currently operated will be transferred to, or reissued in the name of Buyer;

(c) received confirmation from the relevant fiscal intermediary that the fiscal intermediary received the application on Form 855 for Medicare and Medicaid certification of the Hospital for its operation by Buyer effective as of Closing; and

(d) obtained such other consents and approvals as may be legally or contractually required for Buyer's consummation of the transactions described herein.

**8.4 Action/Proceeding.**

(a) No court or any other Governmental Authority shall have issued an order restraining or prohibiting the transactions herein contemplated; and no Governmental Authority shall have commenced any action or suit before any court of competent jurisdiction or other Governmental Authority that seeks to restrain or prohibit the consummation of the transactions herein contemplated or otherwise seeks a remedy which would materially and adversely affect the ability of Buyer to enjoy the full use and enjoyment of the Purchased Assets. Neither the United States Department of Justice nor the Federal Trade Commission shall have requested in writing that Buyer delay or postpone the Closing.

(b) No order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date.

**8.5**     **Sale Order**.  Entry by the Bankruptcy Court of the Sale Order consistent with this Agreement, expressly making Section 363(m) of the Bankruptcy Code applicable to this Agreement, and otherwise in procedure, form and substance reasonably satisfactory to Buyer.

**8.7**     **Cure Obligations.**     The cure obligations with respect to Assumed Contracts (other than the Healthcare Management System, Inc., billing software contract) shall not exceed $170,000.

**8.8**     **Survey**.  At least 10 days prior to Closing, Seller shall furnish to Buyer the existing survey for the Real Property (whether one or more, the "Survey"), which Survey shall be sufficient to satisfy requirements for survey coverage on the Title Policy.  The Survey shall have been recertified to Seller, Buyer, the Title Agent and the Title Company that (i) the Survey was made on the ground; (ii) there are no visible or recorded easements, discrepancies, conflicts, encroachments, or overlapping of improvements except as shown on the Survey; (iii) the Survey correctly shows all visible or recorded easements or rights-of-way of which the Surveyor has been advised, including those matters affecting location of all building, structures, and other improvements situated on the Real Property; (iv) the Survey conforms to all applicable minimum guidelines for surveys of comparable property set forth in applicable Laws, or professional ALTA standards; (v) all streets abutting the Real Property and all means of ingress to and egress from the Real Property have been completed, dedicated, and accepted for public maintenance by city, town or other appropriate political subdivision in which the Real Property is located; (vi) except as shown thereon, the Real Property is not located within the 100-year flood plan or other flood hazard area; (vii) the Survey is a true, correct, and accurate representation of the Real Property; and (viii) such other matters as may be required by the Title Company to allow it to issue to the Title Policy. The scope, findings and conclusions of the Survey shall be satisfactory to Buyer in all reasonable respects.

**8.13**     **Closing Documents**.  Seller shall have executed and delivered to Buyer all of the items required to be executed by Seller as contemplated by Section 3.2 or otherwise pursuant to any term or provision of this Agreement.

**ARTICLE IX**
**CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER**

The obligations of Seller hereunder are subject to the satisfaction, on or prior to the Closing Date, of the following conditions unless waived in writing by Seller:

**9.3**     **Action/Proceeding**.  No court or any other Governmental Authority shall have issued an order restraining or prohibiting the transactions herein contemplated; and no Governmental Authority shall have commenced any action or suit before any court of competent jurisdiction or other Governmental Authority that seeks to restrain or prohibit the consummation of the transactions herein contemplated.  Neither the United States Department of Justice nor the Federal Trade Commission shall have requested in writing that Buyer delay or postpone the Closing.

**9.4**     **Pre-Closing Confirmations**.  Seller shall have obtained documentation or other evidence reasonably satisfactory to it that it has:

     (a)     received approval from all Governmental Authorities whose approval is required to complete the transactions herein contemplated, including any planning approvals; and

     (b)     obtained such other consents and approvals as may be legally or contractually required for their consummation of the transactions described herein.

## ARTICLE XII
## INDEMNIFICATION

**12.2    Indemnification by Seller**.  Seller agrees to indemnify, defend, and hold harmless the Buyer Indemnified Parties from and against any and all Damages that the Buyer Indemnified Parties incur as a result of, or with respect to:

(c)     the Excluded Liabilities and any obligations of Seller that are not specifically assumed by Buyer pursuant to the terms of this Agreement as Assumed Liabilities under Section 2.3 hereof;

(d)     any liabilities or obligations of Seller or any of its Affiliates arising under the terms of the Medicare, Medicaid, TRICARE or any other third-party payor programs or health insurers, in respect of, arising out of or as a result of (i) periods prior to and up to the Closing, or (ii) claims, setoffs or recoupments for overpayments or other excessive reimbursement or non-covered services or any penalties or sanctions relating thereto; and (iii) any risk pools and other risk sharing agreements established in connection with any managed care contract assumed by Buyer hereunder; provided, however, that Seller shall only be liable for such liabilities to the extent they exceed $1,000,000.00 in the aggregate (this amount is an approximation reflecting the liability indicated by Seller for cost reports prior to 2008 plus $100,000 for 2008 cost report); and

(e)     any actions related to any of the foregoing or incurred in enforcing this indemnity.

**12.3    Indemnification by Buyer**.  Buyer agrees to indemnify, defend, and hold harmless the Seller Indemnified Parties from and against any and all Damages that the Seller Indemnified Parties incur as a result of, or with respect to:

(b)     from and after the Effective Time, the Assumed Liabilities and any obligations of Seller that are specifically assumed by Buyer pursuant to the terms of this Agreement as Assumed Liabilities under Section 2.3 hereof; and

(c)     any actions related to any of the foregoing or incurred in enforcing this indemnity.

**12.7    Notice and Control of Litigation**.  If any claim or liability is asserted in writing against a party entitled to indemnification under this Article XII (the "Indemnified Party") which would give rise to a claim under this Article XII, the Indemnified Party shall notify the Person giving the indemnity ("Indemnifying Party") in writing of the same within twenty days of receipt of such written assertion of a claim or liability.  The Indemnifying Party shall have the right to defend a claim and control the defense, settlement and prosecution of any litigation.  If the Indemnifying Party, within twenty days after notice of such claim, fails to defend such claim, the Indemnified Party shall (upon further notice to the Indemnifying Party) have the right to undertake the defense, compromise or settlement of such claim on behalf of and for the account and risk of the Indemnifying Party.  Anything in this Section 12.7 notwithstanding, (i) if there is a reasonable probability that a claim may materially and adversely affect the Indemnified Party other than as a result of money damages or other money payments, the Indemnified Party shall have the right, at its own cost and expense, to defend, compromise and settle such claim, and

(ii) the Indemnifying Party shall not, without the written consent of the Indemnified Party, settle or compromise any claim or consent to the entry of any judgment which does not include as an unconditional term thereof the giving by the claimant to the Indemnified Party a release from all liability in respect to such claim. All parties agree to cooperate fully as necessary in the defense of such matters. Should the Indemnifying Party fail to notify the Indemnifying Party in the time required above, the Indemnifying Party shall be relieved of its obligations pursuant to this Article XII but only to the extent such failure to notify in the time required above materially adversely affects the Indemnifying Party's ability to defend such matter.

**ARTICLE XIII**
**GENERAL**

13.1    **Notices**. Any notice, demand or communication required, permitted, or desired to be given hereunder shall be deemed effectively given when personally delivered, when received by telegraphic or other electronic means (including facsimile and telex) or when delivered by overnight courier, or five days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested to the following address:

|  |  |
|---|---|
| Buyer: | Northstar Hospital, LLC<br>c/o Symbion.<br>Nashville, Tennessee 37203<br>Attn: George Goodwin<br>Fax No. 615/344-2824 |
| with copies to: | Waller Lansden Dortch & Davis, LLP<br>511 Union Street, Suite 2700<br>Nashville, Tennessee 37219-1760<br>Attention: Joseph A. Sowell, III, Esq.<br>Facsimile: (615) 244-6804 |
| Seller: | Lubbock, Texas – Highland Medical Center, L.P.<br>2412 %0th Street,<br>Lubbock, TX 79412<br>Attention: _____<br>Facsimile: |
| with a copy to: | Max Tarbox<br>McWhorter, Cobb & Johnson<br>P.O. Box 2547<br>Lubbock, TX 79400 |

or to such other address or number, and to the attention of such other Person or officer, as any party may designate, at any time, in writing in conformity with these notice provisions.

13.2    **Public Announcements**. Each of the parties hereto mutually agrees that no party shall release, publish or otherwise make available to the public in any manner whatsoever any information or

23

announcement regarding the transactions contemplated hereby without the prior written consent of the other party except for parties to Contracts for purposes of obtaining such parties' consent to assignment of such Contracts to Buyer, information and filings reasonably necessary to be directed to Governmental Authorities to fully and lawfully effect the transactions contemplated hereby or required in connection with securities and other Laws. Nothing herein shall prohibit either party from responding to questions presented by the press or media without first obtaining prior consent of the other party.

**13.3** **Public Relations**. The parties hereto shall cooperate, each with the other, to effectively communicate to the public and to Governmental Authorities with jurisdiction over the transactions contemplated hereby, the nature of the transactions contemplated hereby and the benefits that will accrue to the community by reason of the transactions contemplated hereby. Seller and Buyer shall each provide the other with the name, address and phone number of those individuals who will be responsible for communicating with the media and the public and for developing public relations plans.

**13.4** **Expenses; Legal Fees and Costs**.

(a) Except as otherwise expressly set forth in this Agreement, all expenses of the preparation of this Agreement and of the purchase of the Assets set forth herein, including counsel fees, accounting fees, investment advisor's fees and disbursements, shall be borne by the respective parties incurring such expense, whether or not such transactions are consummated.

(b) Seller shall pay all documentary stamps, Transfer Taxes, recording fees and similar closing costs.

(c) In the event either party elects to incur legal expenses to obtain a third-party enforcement or interpretation of any provision of this Agreement, the prevailing party shall be entitled to recover such legal expenses, including attorney's fees, costs and necessary disbursements, in addition to any other relief to which such party shall be entitled.

**13.5** **No Third-Party Beneficiary**. The terms and provisions of this Agreement are intended solely for the benefit of the parties hereto and their respective successors or assigns, and it is not the intention of the parties to confer third-party beneficiary rights upon any other Person or entity.

**13.7** **Choice of Law**. The parties agree that this Agreement shall be governed by and interpreted, construed and enforced in accordance with the Laws of the State of Texas excluding any conflicts of law rules or principles that would refer the governance or the interpretation, construction or enforcement of this Agreement to the Laws of another jurisdiction.

**13.8** **Benefit/Assignment**. Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, successors and permitted assigns; provided, however, that no party may assign this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld; provided, further, that notwithstanding the foregoing, Buyer shall be entitled to assign its rights under this Agreement, in whole or in part, to an Affiliate of Buyer without obtaining Seller's consent.

**13.9** **Waiver of Breach**. The waiver by either party of breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or other provision hereof.

**13.10** **Severability**.

(a)      If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, and if the rights or obligations of Buyer or Seller under this Agreement will not be materially and adversely affected thereby, (a) such provision will be fully severable; (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom; and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this agreement a legal, valid and enforceable provision as similar in terms (including duration, area or amount) to such illegal, invalid or unenforceable provision as may be possible.

(b)      If any provision of this Agreement is determined by the Bankruptcy Court to prevent Buyer from being deemed a "Qualified Bidder" under the Court's Order entered in the Bankruptcy Case on August 15, 2008, or under any other order of the Bankruptcy Court in connection with any auction held in the Bankruptcy Case, then Buyer shall have the right to remove such disqualifying provision(s) from this Agreement to the degree and extent necessary so that the balance of the Agreement results in Buyer being deemed a "Qualified Bidder."

**13.11    Divisions and Headings**.  The divisions of this Agreement into sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

**13.12    Drafting**.  No provision of this Agreement shall be interpreted for or against either party hereto on the basis that such party was the draftsman of such provision, both parties having participated equally in the drafting hereof, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

**13.13    Entire Agreement/Amendment**.  This Agreement supersedes all previous contracts and constitutes the entire agreement of whatsoever kind or nature existing between or among the parties representing the within subject matter and no party shall be entitled to benefits other than those specified herein.  As between or among the parties, no oral statement or prior written material not specifically incorporated herein shall be of any force and effect.  The parties specifically acknowledge that in entering into and executing this Agreement, the parties rely solely upon the representations and agreements contained in this Agreement and no others.  All prior representations or agreements, whether written or verbal, not expressly incorporated herein are superseded hereby and no amendments or modifications hereto shall be binding unless and until made in writing and signed by all parties hereto.  This Agreement may be executed in two or more counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument.

**13.14    Time of Essence**.  Time is of the essence in the performance of this Agreement.

**13.15    Waiver of Jury Trial**.  EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHTS TO TRIAL BY JURY IN CONNECTION WITH ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**13.16    Interpretation**.  In this Agreement, unless the context otherwise requires:

(a)      references to this Agreement are references to this Agreement and to all Schedules, Exhibits and Annexes hereto;

(b)    references to Articles and Sections are references to articles and sections of this Agreement;

(c)    subject to the provisions of Section 13.8, references to any party to this Agreement shall include references to its respective successors and permitted assigns;

(d)    references to a "Person" shall include references to any individual, corporation, company, body corporate, association, partnership, firm, joint venture, limited liability company, trust or governmental agency.

(e)    the terms "hereof," "herein," "hereby," and derivative or similar words will refer to this entire Agreement;

(f)    the gender of all words herein shall include the masculine, feminine and neuter, and the number of all words herein shall include the singular and plural;

(g)    references to any document (including this Agreement) are references to that document as amended, consolidated, supplemented, novated or replaced by the parties from time to time;

(h)    the word "including" shall mean including without limitation;

(i)    nothing in the Schedules shall be deemed adequate to disclose an exception to a representation or warranty made herein unless the Schedule identifies the exception with reasonable particularity and describes the relevant facts in reasonable detail and without limiting the generality of the foregoing, the mere listing, or inclusion of a copy, of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein (unless the representation or warranty involves the existence of the document or other item itself);

(j)    each representation, warranty and covenant contained herein shall have independent significance and, if any party hereto has breached any representation, warranty or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) which such party has not breached shall not detract from or mitigate the fact that the party is in breach of the first representation, warranty or covenant; and

(k)    references to time are references to local Lubbock, Texas time.

(l)    the phrase "Seller's knowledge", or language of similar import, shall mean, when used in conjunction with any representation or warranty contained in this agreement, that Seller, having undertaken reasonable investigation of its senior officers, including appropriate directors and managers, to determine the existence or absence of any particular state of facts, is not aware of any information which would give actual knowledge of the existence or absence of such facts or actual knowledge that the particular representation or warranty is untrue or misleading.

**13.17 Further Assurances.** On and after the Closing Date, Buyer, Seller shall take all appropriate action and execute all documents, instruments or conveyances of any kind which may be reasonably necessary or advisable to carry out any of the provisions hereof, including putting Buyer in possession and operation control of the Hospital and the Assets or to convey title to the Assets to Buyer.

**[Remainder of page intentionally left blank.]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in multiple originals by their authorized officers, all as of the date and year first above written.

**LUBBOCK, TEXAS – HIGHLAND MEDICAL CENTER, L.P.**

By: _____

Title: _____

**NORTHSTAR HOSPITAL, LLC**

By: _____

Title: _____