Max R. Tarbox; SBN: 19639950
McWhorter, Cobb & Johnson, LLP
1722 Broadway
P. O. Box 2547
Lubbock, Texas 79408
806/762-0214; 806/762-8014 (FAX)
Attorneys for Lubbock, Texas -
Highland Medical Center, L.P.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| Lubbock, Texas - Highland Medical Center, L.P., | § | Case No. 08-50202-rlj11 |
| | § | Chapter 11 Proceeding |
| Debtor. | § | |

**DEBTOR'S COMBINED PLAN AND DISCLOSURE STATEMENT**

**September 29, 2008**

**Introduction**

**Purpose of disclosure statement.** This *Combined Plan and Disclosure Statement* is filed by the

Debtor: Lubbock, Texas - Highland Medical Center, L.P. (sometimes referred to as the "Debtor"). The

purpose of the disclosure statement component of this pleading is to enable the proponent of the plan of

reorganization to comply with section 1125(a) of the Bankruptcy Code, which requires that the proponent

of a plan disclose such information to creditors "of a kind, and in sufficient detail, as far as is reasonably

practicable in the light of the nature and history of the Debtor and the condition of the Debtor's books and

records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the

relevant class to make an informed judgment about the plan." Therefore, by operation of law, the contents

of this disclosure statement must represent the Debtor's affirmative statements that the representation of

actual facts made by it are true to the best of its information, knowledge and belief.

Creditors should primarily analyze the information supplied to determine whether it would be in their

best interest to accept the plan or reject it. In making this determination, creditors should take note of the

importance of their actually voting either to accept or reject the plan. This is so because the Bankruptcy Code

authorizes the bankruptcy court to confirm a chapter 11 plan of reorganization if it is accepted by all

creditors. Normally, if the plan is a reorganization plan, the Debtor must demonstrated that it is feasible.

However, in this case the Debtor has already liquidated all of its assets. Therefore, the Debtor's plan

proposes a fair distribution of the Debtor's liquidated assets. If all classes of creditors accept the plan (by means of a majority vote of the *voting* members of the class whose claims constitute two-thirds or more in value of the outstanding total claims of all the *voting* members of the class), then the bankruptcy court may confirm the plan on a showing of the plan's feasibility or that dissenting creditors will receive as much under the plan as they would have received in a straight liquidation. If not all classes of creditors accept the plan, the plan may still be confirmed on showing of its feasibility and that each creditor will receive under the plan at least as much as each would receive in straight liquidation and that the "absolute priority" rule is observed or waived. It is to be observed that at least one actually impaired class must in any case, affirmatively vote to accept the plan (by a majority of the voting creditors whose claims total at least two-thirds of all the claims of the voting class) or else the bankruptcy court may not confirm the plan. Further, creditors should observe that it is important for each of them to vote because the acceptance or rejection of classes is to be determined on the basis of the voting membership of each class. Nonvoting membership is ignored for the purpose of determining whether a majority of members who holds two-thirds or more of value of claims accepts the plan. A failure to vote will not be counted as a rejection of the plan. Each creditor will also doubtlessly be interested in the schedule of the payments to be made to each of them. Only after reviewing it, in Section V below, can they be reasonably expected to determine whether they are being treated as the law requires.

I. **Bankruptcy Filing**

On May 31, 2008, Lubbock, Texas - Highland Medical Center, L.P. (hereinafter, sometimes referred to as "Highland Medical Center") filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas, Lubbock Division. [docket no. 1].

After the filing of the bankruptcy petition, Highland Medical Center was authorized to continue in business under the protection of the Bankruptcy Code and to attempt to work out an arrangement with creditors on a plan for payment of its debts. This document explains how Highland Medical Center proposes to pay its creditors. If the Bankruptcy Court approves this plan, creditors' rights to collect their debts will be limited by federal law (the Bankruptcy Code). If the Debtor's plan is approved, creditors will only be allowed to collect from Highland Medical Center as provided in this document.

**The Profile and History of Lubbock, Texas - Highland Medical Center, L.P.**

Lubbock, Texas - Highland Medical Center, L.P. of is a limited partnership that owned and operated Highland Community Hospital located in Lubbock, Texas. The general partner is named Highland West Texas Medical Services, Inc. The president and chief executive officer of the corporation is James R Cheek. The secretary is Herschel J. Breig. The general partner was formerly known as Shiloh Health Services of Texas, Inc. of Springfield, Missouri ("Shiloh") and was incorporated in the State of Texas on December 21, 2005. The general partner has an eighty-six and 1/10 percent (86.1%) ownership interest. Shihol's name was changed to Highland West Texas Medical Services, Inc. on May 29, 2008. The limited partners consists of 12 investors who have a combined ownership interest of thirteen and 9/10 percent (13.9%).[1] The partnership headquarters was located in Lubbock at 2412 50th Street, Lubbock, Texas.

A.    **Description of Property**

The Debtor is a medical center complex that, at the time of the filing of this bankruptcy case, was occupied and operated as Highland Medical Center. The property consists of improvements occupying 109,834 square feet situated on a 6.823 acre parcel of land located at the northeast quadrant of 50th Street and University Avenue in the City of Lubbock, Texas.

The hospital was originally built in 1962, with additions made in 1967, 1974 and 1984. It was important to sell the Debtor's assets as a "going-concern" because if the hospital were shut down, it would be very costly to bring the hospital into compliance to satisfy current state regulations.

The improvements were employed as a 123 bed general acute care hospital, to include private patient rooms, five operating suites, a radiological scanner, a seven bed ICU department, an emergency room area, plus administrative and support areas.

B.    **Recent History**

The Debtor acquired the above-described medical complex from Highland Health Systems, Inc., which was affiliated with Community LP Corp. and CHS Holdings Corp. through a purchase agreement dated March 18, 2006. The purchase price was Five Hundred Thousand Dollars ($500,000.00) plus the Debtor

---

[1]    The list of names of the limited partners, and their respective ownership interest, can be found as an Exhibit to Question 21.A of the Debtor's Statement of Financial Affairs.

was required to pay 50% of the EBTDA[2] for the hospital for a 6 year period following the closing of the sale, for an amount not to exceed Five Million Dollars($5,000,000.00). The purchase agreement also stated that if the "Buyer shall sell, lease or otherwise dispose of the Hospital at any time within six (6) fiscal years following Closing, then Buyer shall pay to Seller 50% of the sales proceeds in excess of $500,000."

Subsequent to the purchase and for the two year period leading up to the bankruptcy, the Debtor never had sufficient capital to fund its operations. Furthermore, the hospital lost the support of local physicians, resulting in a declining patient census. The Debtor became severely behind on its credit obligations and also neglected to pay its taxes, including property and payroll taxes. The Debtor also became delinquent on its mortage note to Peoples Bank of Lubbock, Texas. After being unable to satisfy the terms of a forbearance agreement entered into in March of 2008 to stop a judicial foreclosure, the Debtor was subject to a foreclosure by Peoples Bank in June of 2008. In order to prevent the foreclosure, the Debtor filed its bankruptcy case on May 31, 2008.

### C. Bankruptcy Proceeding

After filing the bankruptcy case, the Debtor entered into cash collateral agreements with its creditors having a claim against its accounts receivable. The agreements, which were resubmitted bi-monthly, provided that the Debtor was authorized to expend up to $300,000 for operations for each bi-monthly period up until the date the assets of the Debtor were sold on September 15, 2008.

On July 8, 2008, Carol Jendrzey was appointed by the Court to serve as the Health Care Ombudsman. [docket no. 70].

The Debtor filed its first motion to sell on June 27, 2008. [docket no. 55]. The motion requested an open auction that solicited bids from any party willing to pay an earnest money deposit of $50,000. The motion was withdrawn on July 21, 2008. [docket no. 95].

The Debtor initially attempted to reorganize through a third party which had committed to infuse several million dollars into the hospital plus pay out over a period time all priority and administrative claims, plus a portion of unsecured claims. The Debtor however was unsuccessful in negotiating Debtor-in-Possession temporary financing with certain secured creditors and therefore the proponents of a plan of

---

[2]     EBITA was stated in the purchase agreement to mean "earnings from operations before taxes, depreciation and amortization.

reorganization withdrew their decision to submit a reorganization plan.

The Debtor therefore initiated efforts to sell the assets of the hospital. It was necessary to quickly sell the hospital since it had insufficient capital and revenues to continue operating.

On August 7, 2008, the Debtor filed its motion for approval for scheduling the sale of the Debtor's assets and approving bid procedures. [docket no. 133]. The motion named Northstar Hospital, LLC ("Northstar") as the initial bidder. Northstar had indicated its intention to submitted a bid for $4.1 million less certain "hold-backs." The motion also set forth bidding procedures. The Court entered its order approving the motion on August 15, 2008. [docket no. 151].

On August 15, 2008, the Debtor filed its motion to sell its assets[3], free and clear of all liens, claims and encumbrances with all liens, claims, and encumbrances to attach to the proceeds, by "open-bid" wherein the provisions in the bid procedures motion regarding Northstar being the initial bidder were removed. [docket no. 148]. The motion provided that the Debtor would sell its assets used or usable in connection with the business of Highland Medical, including all facility-related tangible and intangible assets, real estate and (to the extent assignable) licenses, permits, and Medicare and Medicaid provider agreements and numbers, **but excluding** accounts receivable, cash and cash equivalents. The motion provided that for parties to qualify as bidders, they would have to submit a minimum bid of $3,000,000 and pay an earnest money deposit of $50,000,00. The auction was scheduled for September 3, 2008. The qualified bidders were Northstar and Lubbock Heritage Hospital, Inc. ("Heritage"). The motion required that the successful bidder must fund and close the sale by September 15, 2008, otherwise the second bidder would have the opportunity to purchase the assets pursuant to its bid.

The Heritage bid of $3,000,001.00 was the starting bid, inasmuch as it was the highest bid received prior to the commencement of the auction. Northstar declined to increase the Northstar bid at the auction. Accordingly, the Heritage bid was the highest and best bid received by the Debtor and the Northstar bid was the next highest and best bid received by the Debtor.

On September 15, 2008, Heritage delivered $2,950,001.00 to the Debtor which was deposited in a

---

[3] "Assets" consisted of facility-related tangible and intangible assets, real estate and (to the extent assignable) licenses, permits, and Medicare and Medicaid provider agreements and numbers, accounts receivable, cash and cash equivalents. The legal property description for the Facility is that portion of Tract A, a replat of Lots 1-11, excluding Lots 9 and 10 (southwest corner), South College Addition to the City of Lubbock, Lubbock County, Texas.

MCJ trust account. That amount, along with the $50,000.00 earnest money deposit, paid the total purchase price of $3,000,001.00. From this amount, McWhorter Cobb & Johnson L.L.P. paid to the Lubbock Central Appraisal District:

a. $218,245.75 to satisfy the outstanding ad valorem real and personal property taxes, including interest, on the assets sold for 2007 tax year; and

b. $129,053.70 to satisfy the outstanding ad valorem real and personal property taxes, including interest, on the assets sold for 2008 tax year.

The remaining funds in the amount of $2,652,701.55 will be held in the MCJ Trust Account. No further disbursements will be made from these funds without order of the Court.

**D.     Current Status**

The Debtor has assigned control of all of its checking accounts to the Debtor's attorney, Max Tarbox. Tarbox has transferred funds held in Lubbock banks to the Debtor's debtor-in-possession accounts at Lubbock National Bank ("LNB"). As of September 29, 2008, the accounts at LNB totaled $93,920.45 ($10,000.00 of which was pending). As of September 29, 2008, the balance in the Arvest account was $6,332.94. The Debtor is retaining its account at Arvest Bank for the purpose of receiving government Medicaid and Medicare payments. Such payments are transferred to the LNB accounts on a regular basis.

The Debtor is also attempting to collect outstanding accounts receivable. The Debtor hopes to collect from $400,000 to $500,000 in medicare/medicaid receivables and $200,000 to $300,000 in normal accounts receivable.

The Debtor has filed a motion to hire Collectech Diversified, Inc. of Lubbock, Texas to assist in collecting outstanding account receivables. This agency was previously retained by the Debtor to collect aged account receivables and is also being used by other local hospitals for bill collections.

The Debtor is also filing a motion to hire Lawrence, Evans & Co., LLC of Columbus, Ohio which is a healthcare investment bank and consulting firm focused on small and middle market healthcare providers and services companies. Lawrence, Evans & Co., LLC will provide the Debtor with month to month collateral management and comprehensive collection review reports of all accounts receivables of the Debtor. The services include monitoring the daily cash collections, as well as monitoring the collateral billing, posting, and rebilling of accounts by the assigned billing group or assigned collections company.

Furthermore, the new buyer assumed the Debtor's provider numbers to bill and collect Medicare and Medicaid claims with cash collections and receivable remittance of buyer paid to Debtor account for an interim period. These commingled funds need to be closely monitored by date of service, recorded, reported to the court to allow a cash transfer to the buyer. Lawrence, Evans & Co., LLC will provide a comprehensive report detailing by payor the collection amounts, status of remaining accounts, including but not limited to billed, rebilled, and disputed claims.

The Debtor believes that with this joint effort, the Debtor can maximize its collection recovery.

## II.     Creditors' Committee

On September 3, 2008, the U.S. Trustee's Office filed its Appointment of the Official Unsecured Creditors Committee.

## III.    What are Claimants entitled since the Debtor was Liquidated?

Section 1129(a) of the Bankruptcy Code states that the Bankruptcy Court may confirm a plan of reorganization only if certain requirements are met. One of the requirements is that each non-accepting holder of an allowed claim or interest in an impaired class must receive or retain under the plan on account of such claim or interest, property having a value as of the effective date of the plan at least equal to the value that such holder would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on the effective date.

As indicated above, the Debtor received a net recovery of $2,652,701.55 from the sale of its assets, excluding accounts receivable, cash and cash equivalents. The Debtor hopes to receive $600,000 to $800,000 from the collection of accounts receivable.

At this time, it appears that there will be insufficient funds to satisfy claims asserted against the proceeds from the sale and collected accounts receivables. Such claims, consisting of secured claims and possible 11 U.S.C. § 506(c) claims, exceed the amount of funds and potential funds available. In the unlikely event that the Debtor collects sufficient proceeds to satisfy all allowed secured claims, any remaining funds will be paid to unsecured priority claims.[4] In the unlikely event that all secured claims and priority claims are satisfied in full, the remaining funds will be distributed to unsecured creditors on a *pro-rata* basis. At this time, it appears that the unsecured creditors **will not** receive a distribution under the plan.

---

[4]       Such claims would include administrative expenses, wages, taxes, etc. *See* 11 U.S.C. § 507.

IV. **How Does Highland Medical Center Propose to Pay its Debts?**

A. **Creditors Divided Into Classes**.

The Bankruptcy Code requires Highland Medical Center to divide creditors into classes. That is, creditors with similar legal rights are put into the same class. Secured creditors are put in separate classes. Administrative claimants are put into two classes: a) those that are to receive preferred treatment pursuant to 11 U.S.C. § 506(c)[5], and b) all other allowed administrative claims. All unsecured creditors who are not insiders are put into one class.

B. **Creditors Have the Right to Vote on the Plan.**

After reading this plan and disclosure statement, creditors will have the right to vote on whether the Bankruptcy Court should "confirm" the Debtor's plan. Each creditor should read this combined plan and disclosure statement carefully, discuss it with a lawyer, and then fill out the ballot that will be provided. Highland Medical Center's lawyer will assemble the ballots and report to the Bankruptcy Judge on _____, 2008, at _____ at 1205 Texas Avenue, Lubbock, Texas 79401. At that time the Court will conduct the "Confirmation Hearing" in this case and decide whether to "confirm" the plan.

C. **Creditors Also Have the Right to Object to this Disclosure Statement and Creditors Have the Right to Object to Confirmation of the Plan.**

If a creditor believes that this Combined Plan and Disclosure Statement does not contain sufficient information to decide whether to vote for (or against) the Debtor's plan, the creditor may file a written objection to the Disclosure Statement with the Bankruptcy Court. If a creditor believes that the plan does not meet the requirements of the Bankruptcy Code, the creditor may file a written objection to the plan with the Bankruptcy Court. The deadline for objections to confirmation of the plan has been set by the Court: _____ .

D. **The Court May Approve the Debtor's Plan and Limit Creditors' Legal Rights.**

The Court will consider only the written objections to confirmation of the plan that are timely filed and the ballots that are timely filed. If no objections are filed (or if all objections are overruled by the Court) and if at least one class of creditors accepts the plan, the Court may approve the plan. If the Court approves

---

[5]    § 506 (c) - Determination of secured status: the trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

the plan, all creditors will be bound, even if a creditor did not vote and even if a creditor voted against the plan. This means that a creditor will not be allowed to collect its claim against Highland Medical Center except as provided in this plan.

### E. How Does a Class "Accept" the Plan?

Each class is considered separately. Only the creditors who vote are counted. The Court will conclude that the class "accepts" the plan if two requirements are met:

1. More than 50% of the voting creditors vote in favor of the plan; and

2. Those creditors voting in favor of the plan hold at least 2/3 of the total amount of debt that is voted.

### F. What about Administrative Payments?

Administrative claimants consist of claimants who incurred costs and expenses in preserving the estate. This class is divided into two groups: a) those parties that rendered professional services and have had received orders from the Court approving their requested payment for fees and expenses they incured; and b) those parties who have an allowed by the Court to recover costs and expenses they incurred in preserving the estate.

**Professional Services**

**McWhorter, Cobb & Johnson, LLP** are the attorneys representing the Debtor in this case. It was paid a retainer of $50,000.00 at the beginning of the case. It is anticipated that the fees and expenses will total approximately $150,000.00 less the $50,000.00 retainer already received. All fees and expenses of MCJ will be submitted to the Court for final approval before the conclusion of the case. Parties can object to fee applications if they so desire. MCJ is seeking to receive payment ahead of secured creditors pursuant to 11 U.S.C. § 506(c). MCJ will be filing an application to receive such treatment with the Court. To the extent that the MCJ's fees are not satisfied as a Section 506(c) claim, it shall receive payment from funds available after all allowed secured claims are satisfied. MCJ will receive its *pro-rata* share of such remaining funds along with all other allowed administrative claimants.

**Robinson Burdette Martin & Seright, L.L.P.** ("RBMS") is the accounting firm representing the Debtor in this case. It was not paid a retainer. It is anticipated that its fees and expenses will be approximately $12,000.00. All fees and expenses of RBMS will be submitted to the Court for final approval

before the conclusion of the case. Parties can object to fee applications if they so desire. RBMS is seeking to receive payment ahead of secured creditors pursuant to 11 U.S.C. § 506(c). RBMS will be filing an application to receive such treatment with the Court. To the extent that RBMS's fees are not satisfied as a Section 506(c) claim, it shall receive payment from funds available after all allowed secured claims are satisfied. RBMS will receive its *pro-rata* share of such remaining funds along with all other allowed administrative claimants.

**Carol E. Jendrzey** of Cox Smith Matthews Incorporated ("Jendrzey") served as the Patient Care Ombudsman in this bankruptcy case. She was not paid a retainer. It is anticipated that her fees and expenses will be approximately $19,488.17. All fees and expenses of Jendrzey will be submitted to the Court for final approval before the conclusion of the case. Parties can object to fee applications if they so desire. Jendrzey is seeking to receive payment ahead of secured creditors pursuant to 11 U.S.C. § 506(c). Jendrzey will be filing an application to receive such treatment with the Court. To the extent that the Jendrzey's fees are not satisfied as a Section 506(c) claim, it shall receive payment from funds available after all allowed secured claims are satisfied. Jendrzey will receive its *pro-rata* share of such remaining funds along with all other allowed administrative claimants.

**All other Allowed Administrative Expenses**

The Debtor will request that the Court set a deadline for all parties to file for request for payment of administrative expenses. Such expenses that are allowed will be paid *pro rata* with all other allowed administrative claimants from funds remaining after all allowed secured creditors have been paid. The Trustee will also request that certain parties, who have been awarded payment for administrative expenses, receive preferred payment pursuant to 11 U.S.C. § 506(c). To the extent that the Court allows funds out of the proceeds of encumbered assets, such parties will share *pro-rata* distributions from such funds with all other parties entitled to Section 506(c) status. To the extent that the fees are not satisfied as a Section 506(c) claim, remaining administrative claims shall receive payment from funds available after all allowed secured claims are satisfied.

**G.    What about Secured Creditors?**

The Secured Creditors are separated into 7 classes:

**Class 1: Dos Pansoncitos, Inc.** assumed the claim of Peoples Bank and has filed a claim in the amount of $1,599,350.45 secured by a deed of trust against the Debtor's real property and personal property.

**Class 2: NS Funds I, LLC** has a claim estimated to be approximately $1,700,000.00 secured by a deed of trust against the Debtor's real property and a first lien on accounts receivable and personal property.

**Class 3: CHS/Community Health Systems, Inc**. has filed a claim in the amount of $5,060,104.96 based upon a purchase/sale agreement obligation secured by a deed of trust against the Debtor's real property. It also has a claim arising from an equipment lease.

**Class 4: Lubbock Central Appraisal District** ("LCAD") had a statutory lien in the amount of $347,299.45 arising from past due property taxes. Such claim, plus any accrued interest, was paid in full at the time of closing.

**Class 5: ABCO Fire Protection** has a claim in the amount of approximately $57,600.00 secured by a purchase money security interest in a fire suppression equipment.

**Class 6: Jakeco LLC** dba New-Tech Roofing has filed a mechanic and materialsmen's lien for the amount of approximately $82,567.50.

**Class 7: The Internal Revenue Service** has filed a claim in the amount of $3,344,602.43, of which it asserts a $1,710,279.69 lien against Debtor's real property.

**Treatment**: The Debtor intends to file a Complaint to Determine priority, extent and validity of all liens against the Debtor's assets. To the extent funds are available, the Debtor will disburse such funds based upon entitlement determined or approved by the Bankruptcy Court. To the extent that any unsecured claims are not satisfied by payment, the remaining amounts owing to such unsatisfied claims will be treated as an unsecured claim.

**H.     How Much and When Does Highland Medical Center Propose to Pay Unsecured Creditors?**

At this time, the Debtor expects to recover at most $3.5 million. Such amount would not be sufficient to satisfy secured claims and administrative expenses. Accordingly, this plan does not contemplate making any disbursements to unsecured creditors. In the unlikely event that there are funds available after all secured claims and administrative expenses have been paid, such remaining funds will be paid to all unsecured claimants on a *pro-rata* basis. The Debtor will recognize such claims as set forth in the Debtor's bankruptcy

schedules unless a claimant has a different claim evidenced by having an allowed claim arising from filed proofs of claim.[6]

**I.      What about Partnership Interests?**

Highland West Texas Medical Services, Inc. is the General Partner owning 86.1 % of the partnership interest.  The limited partners consists of 12 investors who have a combined ownership interest of thirteen and 9/10 percent (13.9%).  The plan provides after all plan distributions have been made, the partnership will be dissolved.

**J.      Impaired Status of Creditors.**

All classes are impaired with the exception of the first lienholder, who should receive full payment of its claim.

**K.      What about Executory Contracts?**

The Debtor hereby rejects all executory contracts.

**L.      How is the Plan to be Implemented?**

The proceeds of the sale of the Debtor's real and personal property, excluding accounts receivable, cash and cash equivalents, in the amount of $2,652,701.55, will be held in the MCJ Trust Account.  No further disbursements will be made from these funds without order of the Court.

Max Tarbox ("Tarbox"), of the firm of McWhorter, Cobb & Johnson LLP will be responsible for collecting accounts receivable.  To implement a collection plan, Tarbox will do the following:

a.      Hire Collectech Diversified, Inc. of Lubbock, Texas to assist in collecting outstanding account receivables. This agency was previously retained by Highland Medical Center to collect aged account receivables and is also been used by other local hospitals for bill collections.

b.      Hire Lawrence, Evans & Co., LLC of Columbus, Ohio which is a healthcare investment bank and consulting firm focused on small and middle market healthcare providers and services companies. Lawrence, Evans & Co., LLC will provide Tarbox with month to month collateral management and comprehensive collection review report of all accounts receivables of Debtor. The services includes monitoring the daily cash collections per patient account per bank account, as well as monitoring the

---

[6]      The bar date to file proofs of claims is October 21, 2008.

collateral billing, posting, and rebilling of accounts by the assigned billing group or assigned collections company.

Furthermore, the new buyer assumed the Debtor's provider numbers to bill and collect Medicare and Medicaid claims with cash collections and receivable remittance of buyer paid to Debtor account for an interim period. These commingled funds need to be closely monitored by date of service, recorded, reported to the court to allow a cash transfer to the buyer. Lawrence, Evans & Co., LLC will provide a comprehensive report detailing by payor the collection amounts, status of remaining accounts, including but not limited to billed, rebilled, and disputed claims.

c.      Tarbox will also use the services of MCJ to collect receivables. During the first of October, 2008, MCJ will be sending out over 1700 collection letter demanding payment.

The Debtor believes that with this joint effort, the it can maximize collection recovery.

**M.      What to Do for More Information?**

Creditors should talk with a lawyer about their rights and responsibilities in this case. Creditors should have their lawyers call the lawyer for the Debtor, Lubbock, Texas - Highland Medical Center, L.P. It's lawyer is:

> Max R. Tarbox
> McWhorter, Cobb & Johnson, LLP
> 1722 Broadway
> P. O. Box 2547
> Lubbock, Texas 79408
> 806/762-0214; 806/762-8014 (FAX)

If a Creditor does not have a lawyer but still wants more information, that Creditor can call Highland Medical Center's lawyer directly. HOWEVER, REMEMBER THAT HIGHLAND MEDICAL CENTER'S LAWYER CANNOT GIVE CREDITORS LEGAL OR FINANCIAL ADVICE BECAUSE DEBTOR'S LAWYER REPRESENTS THE DEBTOR, NOT CREDITORS.

**V.      Are There Any Alternatives to This Plan?**

No. This is a liquidating plan. The funds collected by the Debtor will be disbursed pursuant to Court order and direction.

**VI.      Are There Any Tax Effects of This Plan?**

A.      Tax Effects for Highland Medical Center: Since the Debtor will show a net loss from operations, the Debtor does not anticipate paying any income taxes. The Debtor believes that all post-petition

payroll taxes are paid.  Debtor does not anticipate any capital gains tax from the liquidation of assets.

B.    Tax Effects to Creditors:  Creditors should consult with their own tax advisor.

**VII.    Debtor's Obligation to the U.S. Trustee**

During the pendency of this bankruptcy case, the  Debtor will comply with all regulations promulgated by the Office of the U.S. Trustee, including remaining current on all quarterly fees assessed against the estate by the U.S. Trustee.

**VIII.    Retention of Jurisdiction**

The Court shall retain jurisdiction of this case pursuant to the provisions of Chapter 11 of the Bankruptcy Code until the final allowance or disallowance of all claims and final determination with respect to all matters including the following:

1.    To enable the  Debtor to consummate any and all proceedings that they may bring to set aside liens or encumbrances to determine the validity, extent and enforceability of any lien or to recover any preferences, transfer, assets or damages to which it may be entitled under applicable provisions of the Bankruptcy Code or other federal, state, or local law.  Specifically, the  Debtor shall be authorized before or after confirmation to bring any action against any party arising before or after confirmation;

2.    To adjudicate all controversies concerning the classification or allowance or reconsideration of allowances of any claim or any security interest, including without limitation, to liquidate claims in connection with any disputed, contingent or unliquidated claims;

3.    To hear and determine all claims arising from the rejection or assumption of any executory contracts, including leases and to consummate the rejection and determination thereof;

4.    To adjudicate all claims to a security or ownership interest in any of the  Debtor's property or any proceeds thereof;

5.    To adjudicate all claims or controversies arising out of any purchases, sales, or contracts made or undertaken by the  Debtor during the pendency of the proceedings;

6.    To recover all assets and properties of the Debtor wherever located;

7.    To adjudicate all claims pertaining to preferences and fraudulent transfers.

8.    To apply to the Court any time after confirmation for authority to consummate a sale of the estate assets, provided, the  Debtor shall not be required to do so, as long as the  Debtor is otherwise in compliance with the provisions of the plan;

9. To determine the reasonableness of and make any award for administrative expenses, including attorney's fees applied for before or after the plan confirmation date, and to provide for payment thereof.

Additionally, the Court shall retain exclusive jurisdiction in the future for the purpose of determining whether or not a default has occurred and for the purpose of granting any remedy to any creditor hereunder which is authorized by the Bankruptcy Code.

## IX. Please Vote For This Plan!

Highland Medical Center asks that creditors vote in favor of the Debtor's plan because it will allow Highland Medical Center to liquidate its assets and make an appropriate distribution to claimants.

REMEMBER THAT THE DEADLINE FOR BALLOTS IS _____, 2008. Mail your ballot to:

> Max R. Tarbox
> McWhorter, Cobb & Johnson, LLP
> 1722 Broadway
> P. O. Box 2547
> Lubbock, Texas 79408
> 806/762-0214; 806/762-8014 (FAX)

Date: September 29, 2008

Approved:

Lubbock, Texas - Highland Medical Center, L.P.
By: Highland West Texas Medical Services, Inc., its sole general partner

By:   /s/  James R. Cheek
     James R. Cheek,
     President

Respectfully submitted,

McWhorter, Cobb & Johnson, LLP
1722 Broadway
Lubbock, Texas 79401
(806)762-0214; FAX (806)762-8014

By   /s/  Max R. Tarbox
     Max R. Tarbox
     State Bar No. 19639950
     Attorneys for Debtor: Lubbock, Texas - Highland
     Medical Center, L.P.

X:\USERS\MAX\Bankruptcy\CH11DEBT\Highland Medical\Plan & DS\Combined Plan & DS.wpd